[No. E002983. Fourth Dist., Div. Two. Mar. 30, 1987.]

JAMES NATTER, Plaintiff and Appellant, v.
PALM DESERT RENT REVIEW COMMISSION, Defendant and
Respondent;
TENANTS OF PORTOLA PALMS MOBILEHOME PARK, Real Parties
in Interest and Respondents.

COUNSEL

Hart, King & Coldren and Robert S. Coldren for Plaintiff and Appellant.

Best, Best & Krieger, David J. Erwin and Barbara Kristal for Defendant and Respondent.

No appearance for Real Parties in Interest and Respondents.

OPINION

KAUFMAN, J.*—Petitioner James Natter, manager of the Portola Palms Mobilehome Park acting on behalf of the park's owners, appeals from the superior court's denial of his petition for a writ of administrative mandate. His mandate petition sought to overturn a decision of the Palm Desert Rent Review Commission (Commission) granting a hardship rent increase of $19.05 per space per month instead of the $33.13 increase requested.

The previous owner of Portola Palms noticed and effectuated a $25 rent increase shortly before the present owner purchased the mobilehome park in 1983. Subsequently, while the property was in escrow, Palm Desert enacted and made effective its mobilehome park rent control ordinance. The crux of this dispute is the question of what weight should have been accorded

*Assigned by the Chairperson of the Judicial Council.

the previous owner's $25 rent increase in the determination of the present owner's 1985 hardship rent increase.

Natter asserts the Commission's refusal to "annualize" the previous owner's rent increase, i.e., to give it a full year's effect in calculating the park's base net operating income (NOI), unconstitutionally deprived the owner of a fair return on the property. We are not required to resolve appellant's constitutional contentions because we have concluded the Commission's failure to annualize the park's rents was based on an erroneous interpretation of the ordinance and the hardship rent increase guidelines adopted thereunder.

### The Ordinance and the Guidelines

Chapter 9.50 of the Code of the City of Palm Desert, entitled "Mobile Home Park Rent Review," was added by ordinance No. 329 on June 23, 1983, and became effective 30 days later. The ordinance recites it was enacted to counter an "inequitable market situation" which resulted in a shortage of vacant mobilehome park spaces and a corresponding increase in rent levels. The ordinance's preamble states: "[T]he City Council finds and declares it necessary to protect the residents of mobile homes from unconscionable changes in rental rates and unreasonable changes in park rules and regulations while simultaneously recognizing and providing for the needs of park owners to receive a just and reasonable return on the present fair market value of their property . . . ."

The ordinance created the Palm Desert Rent Review Commission consisting of five members appointed by the city council.[1] The Commission is authorized to receive, investigate and rule upon requests for rent increases and to adopt administrative guidelines to effectuate the purposes of the ordinance.

The basic system of rent control established under the ordinance is as follows. Mobilehome park owners are allowed an automatic, annual increase in space rents which they may notice and effectuate without filing any formal request. Section 9.50.060 of the ordinance, entitled "Maximum rent," states: "Except as otherwise provided in this chapter, the maximum rent for each mobile home space that management of a mobile home park shall request, demand or receive shall not exceed three-quarters (¾ths) of the increase in the cost of living as indicated in the Consumer Price Index. Said increase

---

[1]The Commission is referred to as a rent review *board* in the ordinance but as a commission in the hardship rent increase guidelines adopted later. The Commission's own hearing officer in this case referred to it as a board, yet the body's minutes and hearing transcript refer to it as a commission. For simplicity we shall refer to it as the Commission.

shall initially *be calculated from the monthly space rent charged on April 28, 1983* and shall be determined based upon the latest available Consumer Price Index for the twelve (12) month period preceding the date of the rate increase." (Italics added.) Counsel for the Commission indicated at oral argument that April 28, 1983, was selected as a base date because that was when rent control first was proposed in the Palm Desert City Council. Before then the possibility of rent control was not yet "in the wind" and thus the rents up to that time had been adjusted in a free market environment.

Ordinance section 9.50.070 establishes the procedure under which a park owner may seek a hardship rent increase in excess of the maximum allowable under the automatic annual rent increase formula. Hardship rent increase requests are first considered by a hearing officer appointed by the Commission, who conducts an adjudicatory hearing on the matter and issues a summary of the evidence with proposed findings and recommendations for decision by the full Commission. When any party requests it, the Commission then holds its own hearing on the materials provided by the hearing officer and then may adopt the proposed findings and recommended decision as is, make amendments and deletions for adoption, or remand the entire matter to the hearing officer for further proceedings.

The ordinance states a hardship rent increase ". . . shall be given where the [Commission] finds that the application of the ordinance apart from such authorized increase . . . results or would result in undue hardship to the mobile home park owner or would prevent a mobile home park owner from obtaining a just and reasonable return on the mobile home park owner's property. In determining whether a hardship rent increase should be authorized, the [Commission] may consider, among other relevant factors, increased cost to the mobile home park owner attributable to increases or decreases in master land and/or facilities lease rent, utility rates, property taxes, insurance, advertising, government assessment and fees, incidental services, normal repair and maintenance, capital improvements, upgrading and addition of amenities or services, net operating income, as well as just and reasonable return on the mobile home park owner's property." (Ord. § 9.50.050, subd. (E).)

Shortly after the effectuation of the rent control ordinance and pursuant to it, the Commission adopted its guidelines for hardship rent increases (guidelines). The guidelines provide a hardship rent increase formula intended ". . . to permit rent to be established at a level which will provide landlords with a fair return on their property . . . ." (Guidelines § 100.) The formula is based on the selection of a "base" time preceding the introduction of rent control in Palm Desert when a free-market situation last operated without the influence of governmental controls on rents. This theoretical

basis for the formula is evidenced by the following introductory statement in the guidelines: "[I]t shall be presumed that the net operating income produced by a property during the base year provided a fair return on property." (*Ibid.*)

The formula for calculating allowable hardship rent increases is set out in the guidelines at section 101: "[T]he landlord's net operating income will be increased by fifty per cent (50%) of the increase in the Consumer Price Index (CPI) over the base year." The guidelines in turn define the net operating income (NOI) as gross rental income minus allowable operating expenses. The gross rental income of a mobilehome park includes the gross rents computed at the rate of 100 percent paid occupancy, any interest earned on security deposits, and all other miscellaneous income received for park services less any uncollected rents which result from vacancy or bad debts to the extent that the same are beyond the landlord's control. The operating expenses subtracted from gross income to calculate NOI include reasonable management fees and expenses, reasonable attorney's fees incurred in the normal conduct of business, repair and maintenance, owner-performed labor, real property taxes, license and registration fees, utility costs, and reasonable capital expenses. Excluded from allowable operating expenses are unreasonable expenditures, mortgage principal and interest payments, lease purchase payments, depreciation, penalties, attorney's fees attendant to litigation, and expenses for which the landlord has received reimbursement through security deposit, settlement, or payment of damages.

Guidelines section 102, subdivision (D), states: "Base year for purposes of this regulation shall be calendar year 1982 or the most recent fiscal year ending on or prior to April 30, 1983, if the records of that property were kept and reported to the Internal Revenue Service on a fiscal-year basis." The guidelines also create a formula for calculating the Consumer Price Index (CPI) differential, half of which is to be applied to the prerent control NOI to maintain a fair return on the owner's property: "The increase in CPI shall be calculated by subtracting the CPI for December 1982 from the CPI for the most recently reported month at the time of filing of the petition [for hardship rent increase], and dividing the resulting figure by the CPI for December 1982." (Guidelines § 101.)

While the ordinance and guidelines presume the prerent control NOI represents a fair return on a mobilehome park owner's property, the guidelines provide a method for owners to rebut this presumption and to request the Commission to adjust the base year NOI accordingly. Guidelines section 103, subdivision (B), creates a conclusive presumption the base year NOI was *not* providing a fair return on the owner's property if that NOI was less

than 50 percent of the gross income in that year. "In such a case, for purposes of determining base year net operating income, gross income shall be adjusted upward to twice the amount of adjusted base year operating expenses." When this conclusive presumption is not applicable, an owner seeking a hardship rent increase may still rebut the presumption the NOI provided a fair return on the property by showing either (1) that his operating and maintenance expenses in the base year were unusually high or low or (2) "[t]hat the rent on the *base date* was disproportionate . . ." (italics added) compared to rents received at other times because of some lease provision, seasonal fluctuation, or the return of premiums or rebates. (Guidelines § 103, subd. (A).)

### The Hardship Rent Increase Petition

The facts in the case at bench are not in dispute. Portola Palms Mobile-home Park is presently owned by Natter's father and mother, who do not take an active role in the park's management. Natter himself is the sole owner and operator of the close corporation which manages the park.

Natter's parents first expressed an interest in purchasing Portola Palms in April 1983. A contract for purchase was executed in May 1983, and escrow closed in August 1983. In the interim Palm Desert enacted and made effective its rent control ordinance. Portola Palms's last preordinance rent increase was a $25 per space per month increase noticed by the previous owner in November 1982 and effectuated at the beginning of February 1983. Automatic, annual 75 percent CPI rent increases under the ordinance were effected in 1984 and again in early 1985.

The present "Petition for Hardship Rent Increase" was filed with the Commission on May 28, 1985, and the matter came on for hearing on July 15, 1985. In the figures requested on the petition form, Natter calculated the gross rental income for the base year by multiplying 12 times the rent levels as they stood in late April 1983; this calculation "annualized" the $25 per space per month rent increase effectuated by the previous owner 3 months before in early February 1983. Natter apparently used the same base rent figures in his hardship rent increase request as were used in the calculation of the automatic 75 percent CPI rent increase effectuated earlier in 1985.

In issuing his findings and recommendations to the Commission, the hearing examiner rejected the annualization of the February 1983 $25 rent increase. The examiner stated: "The Base Year Gross Rental Income figure . . . listed in the Petition is not accurate. . . . In November 1982 the 60-day Notice of a $25.00 per month rent increase was given to the homeowners. That increase was not collected until February 1983. The parkowner has

computed his base-year gross rents (and, hence, his base-year NOI) as though he had been receiving that $25.00 per space per month for the entire year of 1982. ... [¶] ... Ordinance section 9.50.060 establishes the *Base Rent Level* as of April 28, 1983 for the purpose of the automatic 75% CPI increases. The parkowner has been able to take advantage of that higher rent level for the 75 percent CPI increase[s he effectuated in 1984 and early 1985]. Guidelines Section 101D uses calendar year 1982 for the purpose of determining *Base Year N.O.I.* (the Guidelines also allow NOI to be computed on the basis of a fiscal year ending on or before April 30, 1983 but only if the parkowner maintained his records for that fiscal year for IRS reporting purposes). There simply does not appear to be any authority for the Commission to annualize 1982 gross rents based upon a rental increase that became effective [in] February 1983."

After adjusting the park's gross rental income downward to reflect the rent levels before the February 1983 increase, the hearing examiner recommended granting a hardship rent increase of $12.27 per space per month. He specified the increase should last for 12 months after which rents should be reduced by $8.33 per space per month. The temporary nature of the hardship rent increase and the recommended subsequent decrease in rents are not presently in controversy.

Natter petitioned the full Commission for review of the hearing examiner's findings and recommendations. In written and oral statements before the Commission, Natter and his attorney argued Portola Palms was in a unique position regarding the timing of the February 1983 rent increase. They urged the Commission to interpret the ordinance and guidelines to permit annualization of the $25 increase for purposes of calculating the base year NOI and further argued that any refusal to so modify the hearing examiner's recommendations and grant the full $33.13 hardship rent increase requested would unconstitutionally deprive the owner of a fair return on the property.

After considering the matter in closed session, the Commission adopted a compromise. Contrary to the hearing examiner's conclusion, it concluded the guidelines permitted the use of an NOI base year ending as late as April 30, 1983. Transposing the base year four months forward in time allowed the inclusion of three months (Feb. through Apr. 1983) of gross rental income at the higher rent effected by the previous owner's $25 increase. The Commission accordingly adjusted the hardship rent increase upward to the amount of $19.05 per space per month for the first 12 months, to be reduced by $10.72 per space per month thereafter.

Natter's petition for a writ of administrative mandate to compel the Commission to annualize the February 1983 $25 increase and grant the full $33.13 hardship rent increase requested was denied by the superior court.

## Discussion

Because we have concluded that reversal is required on other grounds, it is unnecessary to resolve Natter's various contentions attacking the constitutionality of Palm Desert's rent control law as it was applied to him. (*Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65-66 [195 P.2d 1]; see *Overton v. State Personnel Bd.* (1975) 46 Cal.App.3d 721, 726 [120 Cal.Rptr. 226].)

### The Commission Exercised Its Discretion on the Basis of an Erroneous Interpretation of the Rent Control Law

The guidelines in this case set up a presumption that the operation of market forces up to some base time before the advent of rent control accurately set rents which provided landlords a just and reasonable return on their property. (Guidelines § 100.) The base time chosen by the drafters of the ordinance and guidelines in codifying this presumption was late April 1983. The specific date chosen in the ordinance for calculation of the automatic 75 percent CPI increase was April 28, 1983, the date upon which the rent control law was first formally proposed by the Palm Desert City Council. Similarly, the guidelines contemplate the use of a fiscal year ending as late as April 30, 1983, for the calculation of NOI in reviewing petitions for hardship rent increases.

Natter makes no contention that late April 1983 was an improper chronological reference point for selection as a base time in the rent control provisions. Neither does he contend the rent charged at Portola Palms in late April 1983 did not then provide him a just and reasonable return on his property. On the contrary, he urges that it did, but that it is *that* rent, if annualized, which now provides a just and reasonable return in an NOI calculation, not the lower rent charged at some earlier time or some rental average over the preceding 12-month period. By contrast, the Commission contends the ordinance and guidelines do not authorize it to annualize rents in the manner Natter requests.

We agree with Natter that properly interpreted the ordinance and guidelines indicate the propriety of such an annualization of rents in this case. Accordingly, we conclude the Commission abused its discretion in concluding the ordinance and guidelines required the use of some rent level

which existed before late April 1983 in the calculation of a base NOI on the property.

The strongest indication that drafters of Palm Desert's rent control law contemplated the annualization of rents in a case such as this derives from the hardship rent increase guidelines provision which permits the rebuttal of the presumption that a calculated base year NOI provides a fair return on the property. Guidelines section 103, subdivision (A), provides in pertinent part: "If the Commission determines that the base year NOI yielded other than a fair return on property it shall adjust the base year NOI accordingly. The Commission shall not make such determination unless it has first made at least one of the following findings:

".   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"2.   That the rent on the base date was disproportionate due to one of the enumerated factors below. In such instances, adjustments shall be made in calculating gross rents consistent with the purposes of these standards[:]

"a.   The rent on the *base date* was established by a lease or other formal rental agreement which provided for substantially higher rent *at other periods during the term of lease*;

"b.   The rent on the *base date* was substantially *higher or lower than at other times of the year* by reason of seasonal demand or seasonal variations in rent;

"c.   The rent on the *base date* was substantially *higher or lower than preceding months* by reason of premiums being charged or rebates given for reasons unique to particular units or limited to the period determining the base rent." (Italics in original deleted; other italics added.)

By the inclusion of the foregoing language in the guidelines, which were targeted to requests for hardship rent increases such as the one involved in this case, the drafters of Palm Desert's rent control law made very clear that the base rents to be used in calculating NOI were to be derived from a single date rather than averaged over a more extended period. The quoted guidelines section specifically refers to the rent from a "base date" rather than from a "base year." Further, owners were permitted to show the rent from a base date was disproportionate and not indicative of actual rent levels through a comparison with rents charged at other times during the year. Unless the drafters of this law envisioned the calculation of NOI through an extrapolation, or an "annualization," of rents from a prerent control base date, the preceding language describing the manner in which aggrieved owners are

permitted to rebut the presumption of fair return would be practically meaningless.

Moreover, interpreting the ordinance and guidelines to comprise an annualization provision for cases such as this would conform to the NOI theory which has been sanctioned by the Supreme Court as satisfying constitutional concerns. "Rent control enactments typically use the rent charged on a prior *date* as a starting point for the fixing of maximum rents on the theory that it approximates the rent that would be paid in an open market without the upward pressures that the imposition of rent control is intended to counteract." (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 166 [130 Cal.Rptr. 465, 550 P.2d 1001], italics added.) The optimal base date for a rent control program is one that is ". . . early enough to avoid incorporating last-minute increases made by landlords in anticipation of the controls" yet which marks ". . . the latest time at which rents had been set in an unregulated market . . . ." (*Ibid.*) Manifestly, an NOI-based rent control system, such as the one created by the ordinance and guidelines before us in the present matter, contemplates the use of rent levels as they existed at the *moment* before the introduction of rent control. The inclusion of rent levels from a year before the advent of rent control, whether by averaging the rents over that year or by annualizing the earlier rent level, would deviate from the NOI theory by failing to give full significance to the rent levels directly prior to the introduction of rent control.

It is suggested that because many expenses do not occur at an even rate and must therefore be calculated on the basis of a substantial period of time such as a year, rental income must likewise be calculated over the same period of time. However, that is not so. If the theory is correct that the last rent fixed under free market conditions will have produced a just and reasonable return, it is *that rate* of rent which must be accepted as the base figure, not some rental rate charged at an earlier time. By contrast, out-of-pocket expenditures fluctuate irregularly and are not directly responsive to market forces or, for that matter, the prospect of rent control. Expenses would hardly be expected to rise or fall precipitously on account of the prospect of rent control. Because of the irregularly fluctuating nature of expenses their extrapolation from momentary expenditures without reference to actual expenditures over a substantial period of time would yield a result too inaccurate for the calculation of an NOI useful as a base for future rent adjustments.

The hardship rent increase guidelines in the instant case demonstrate that differences between gross operating expenses and gross rental income were contemplated as part of Palm Desert's rent control system. The guidelines call for the Commission and its hearing examiners to carefully review operating expense records to determine which expenditures were reasonable in

the conduct of business and therefore to be subtracted from gross rental income to calculate fair return. The delineation of particular categories of expenditures which are and are not allowable as operating expenses in the NOI formula requires consideration of expense experience over a period of time. Gross rental income, on the other hand, is treated by the guidelines in a manner which implicitly recognizes the propriety of calculating NOI by extrapolation from a singular rent level. For example, gross rents must be computed as if the mobilehome park is 100 percent occupied and all tenants pay their rent regularly. Furthermore, interest on security deposits retained by owners is imputed at a particular rate unless the deposits actually earn greater interest.

Code of Civil Procedure section 1094.5, pursuant to which the writ for administrative mandate was sought, states in subdivision (b) that "Abuse of discretion is established if the respondent [agency] has not proceeded in the manner required by law . . . ." Because the Commission exercised its discretion on the basis of an erroneous interpretation of the ordinance and guidelines in this case, a writ of administrative mandate should have issued from the superior court directing the Commission to annualize the rental rates last set under free market conditions, that is, those which incorporated the $25 per month increase effectuated in early February 1983 and which were in effect in late April 1983.

### Disposition

The judgment denying the petition for a peremptory writ of mandate is reversed. The court is directed to issue a peremptory writ of mandate directing the Palm Desert Rent Review Commission to set aside its decision of September 11, 1985, granting petitioner a hardship rent increase of $19.05 per space per month and to recalculate his hardship rent increase in a manner consistent with this opinion.

McDaniel, Acting P. J., and Hews, J., concurred.