[No. B059370. Second Dist., Div. One. June 30, 1992.]

MAYME ABRAMSON, Plaintiff and Appellant, v.
CITY OF WEST HOLLYWOOD et al., Defendants and Respondents.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of that portion of the Discussion under the subheading *Other Issues*.

## COUNSEL

Mayme Abramson, in pro. per., for Plaintiff and Appellant.

Michael Jenkins, City Attorney, Richards, Watson & Gershon, Marsha Jones Moutrie and Efrat M. Cogan for Defendants and Respondents.

## OPINION

**SPENCER, P. J.**—Mayme Abramson appeals from the judgment entered following denial of her petition for a writ of mandate (Code Civ. Proc., § 1094.5) challenging a resolution of respondent City of West Hollywood Rent Stabilization Commission (Commission),[1] which denied her application for a rent increase. We find that City calculated Abramson's gross rental income in an unauthorized manner and therefore reverse.

### BACKGROUND

Abramson is an elderly widow who owns a nine-unit apartment building in West Hollywood. She resides in one of the units. In 1985, the newly created City of West Hollywood enacted a rent stabilization ordinance (Ordinance), the purpose of which is "to protect tenants from unreasonable and excessive rents . . . and at the same time to ensure a just and reasonable return to landlords." (West Hollywood Mun. Code, § 6401.)[2]

Under Ordinance, rent increases are automatically permitted which provide landlords with an amount not to exceed 75 percent of the increase in the consumer price index, and when a rental unit is voluntarily vacated after five years or more. (§§ 6409-6410.) Upon application, City is required to "permit rent increases in the MAR [maximum allowable rent] such that the landlord's net operating income[3] shall be increased by sixty percent (60%) of the percentage increase in the Consumer Price Index [CPI], over the base year [of 1983]." (§ 6411(C)(1)(h).)

---

[1]Abramson also named City of West Hollywood and City of West Hollywood Rent Stabilization Department as respondents. For convenience, all three respondents will sometimes be referred to collectively as "City."

[2]Unless otherwise specified, all further statutory references are to the West Hollywood Municipal Code.

[3]Section 6411(C)(1) provides, in pertinent part:

"a. *Net operating income* equals gross income minus operating expenses.

"b. *Gross income* equals the following:

"(i) Gross rents, computed as gross rental income at one hundred percent (100%) occupancy, plus

"(ii) Interest from security and cleaning deposits (except to the extent that said interest is payable to the tenants), plus

In February 1988, Abramson filed rent increase application No. I-048 (hereafter I-048), seeking an increase pursuant to section 6411(C). Based on the procedure established by Ordinance and its accompanying regulations, the matter was first heard by a hearing examiner, and then appealed to Commission. On April 12, 1989, Commission partially granted I-048, permitting an increase in Abramson's MAR.[4]

On October 31, 1989, Abramson filed rent increase application No. I-061 (hereafter I-061), which is the subject of this appeal. The application papers provided by City included a form requesting the landlord's rental income for both the base year of 1983 and for the "current year." Current year was defined as "twelve consecutive months of [the applicant's] choosing within the fourteen months immediately preceding the filing." The instructions required that, in calculating current income, the landlord assume all units "were occupied by tenants for the entire year" and "estimate a fair market value" of units on which "no rent or partial rent [was being received] due to owner, relative or employee occupancy." Pursuant to these instructions, Abramson selected November 1, 1988, through October 31, 1989, as her current year, and stated that her income was $57,911.62.[5]

In a decision filed on February 1, 1990, the hearing examiner rejected the current year rental income figure provided by Abramson. The hearing examiner found that, in order to avoid "duplicate increase[s in rent] which would be excessive and thereby would violate the express provisions of [ ] Ordinance," it was necessary to calculate the current year's gross rental income by annualizing the MAR granted in I-048.[6] Accordingly, it was determined that an additional $5,725.60 should be included in Abramson's current year income, and she was therefore not entitled to an increase in her MAR.[7]

Abramson appealed the hearing examiner's decision to Commission, arguing, inter alia, that the MAR of I-048 had been annualized without notice,

---

"(iii) Income from services, garage and parking fees, plus

"(iv) All other income or consideration received or receivable for or in connection with the use or occupancy of rental units and housing services, minus

"(v) Uncollected rents due to vacancy and bad debts to the extent the same are beyond the landlord's control. Uncollected rents in excess of three percent (3%) of gross rents shall be presumed to be unreasonable unless established otherwise."

[4]The total rent increase granted in I-048 was 15.3 percent. Because Ordinance permits rents to rise a maximum of 12 percent per year (§ 6411(C)(1)(h)), 3.3 percent of the I-048 increase was deferred until April 12, 1990.

[5]This income figure was comprised of the lower rental rate in effect from November 1, 1988, through the grant of I-048 on April 12, 1989, and the higher rental rate in effect from April 13 through October 31, 1989.

[6]The annualized figure included the entire 15.3 percent increase granted in I-048.

[7]The hearing examiner observed that Abramson's perceived shortfall occurred "primarily because of the delay between the filing of the initial application in I-048 and its finality."

and that such annualization was contrary to City's instructions for rent increase applications, which she had scrupulously followed. In a resolution adopted on March 28, 1990, Commission rejected Abramson's argument, agreeing with the hearing examiner that Abramson's gross rental income should be calculated by annualizing the MAR increases granted in I-048. The resolution provided an example of how duplicative rent increases might result from failure to annualize,[8] and found that annualization was supported by *Natter* v. *Palm Desert Rent Review Com.* (1987) 190 Cal.App.3d 994 [235 Cal.Rptr. 718].[9]

On June 25, 1990, Abramson filed a petition for a writ of mandate challenging City's resolution in I-061. The petition was denied at a hearing conducted on April 26, 1991. A judgment denying the petition was filed on May 13, 1991.

## DISCUSSION

*Introduction*

Abramson, in propria persona, has raised 11 enumerated contentions challenging the trial court's denial of her petition for a writ of mandate. Many of her contentions are duplicative; in other situations, a single heading contains more than one legal contention.

In the published portion of this opinion, we deal with Abramson's primary contention—that annualization of her MAR was unauthorized—and with a minor mathematical error, which has been conceded by City. The remaining contentions require only brief discussion, and are addressed in the unpublished portion of this opinion.

*Calculation of Income*

The main dispute between the parties is whether, pursuant to section 6411, Abramson's income for the current year of I-061 should be

---

[8]Commission's resolution provides, in pertinent part:

"(a) For example, the following would result under facts and circumstances similar to those raised in this application:

"Application 1: The Landlord is found to require an increase of $10,000 in order to satisfy the guaranteed return under [ ] Ordinance.

"Application 2: Six months later, the Landlord files Application 2. Six months would yield half of the increase awarded in Application 1, or $5,000. Applying the formula, would indicate that the Landlord required an increase of $5,000, which $5,000 she has already received in Application 1.

"Following [Abramson's] argument, the Landlord would has [*sic*] received a rent increase of $10,000 under the amount needed to provide a just and fair return, and an additional, rent increase of $5,000 under Application 2, for a total increase of $15,000."

[9]The resolution also noted that the hearing examiner's observation about delay in I-048 was dictum, and that the right to challenge that determination had expired.

calculated with reference to actual rent receipts or by annualizing the MAR granted in I-048. Because we find no basis in section 6411 or any other provision of City's rent control scheme to permit annualization, we hold that City erred in its determination of I-061.

We start with the language which governs the calculation of gross rental income, section 6411(C)(1)(b). "Pursuant to established principles, our first task in construing a statute [10] is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citations.] A statute should be construed whenever possible so as to preserve its constitutionality. [Citations.]" (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

 "The contemporaneous construction of a new enactment by the administrative agency charged with its enforcement, although not controlling, is entitled to great weight. [Citations.]" (43 Cal.3d at pp. 1388-1389.) "[T]he final interpretation of a statute is a question of law and rests with the courts. [Citations.]" (*Department of Water & Power* v. *Energy Resources Conservation & Development Com.* (1991) 2 Cal.App.4th 206, 220 [3 Cal.Rptr.2d 289].)

 "Income," as utilized throughout section 6411(C)(1)(b), is commonly defined as "a gain or recurrent benefit that is usu[ally] measured in money and for a given period of time. . . ." (Webster's Third New Internat. Dict. (3d ed. 1976) p. 1143.) As applied here, such a definition would at least imply the rent actually received during the current year.

Furthermore, the instructions supplied to Abramson by City specifically define "current year" to include any 12 of the preceding 14 months. In

---

[10]"The construction of a municipal ordinance is governed by the same rules as the construction of statutes. [Citation.]" (*City of Los Angeles* v. *Los Olivos Mobile Home Park* (1989) 213 Cal.App.3d 1427, 1433 [262 Cal.Rptr. 446].)

calculating income based on the actual receipts of the 12 months immediately prior to her application, Abramson was doing exactly what the instructions required.

City advances two reasons why Ordinance should be read to permit an annualized calculation of MAR. Neither reason has merit.

First, City asserts the language of subdivisions (i) and (iv) of section 6411(C)(1)(b), providing that units be deemed 100 percent occupied and that uncollected rents due to vacancies and bad debts be included as income, "authorizes [it] to consider income which the landlord *will receive* in connection with the use or occupancy of the building." (Italics in original.) While it is true that Ordinance creates a legal fiction with respect to occupancy and uncollected rents, there is no basis to extend this fiction to permit annualization of MAR. Indeed, the doctrine *expressio unius est exclusio alterius*[11] would appear to preclude such annualization.

Second, City places great reliance on *Natter* v. *Palm Desert Rent Review Com., supra,* 190 Cal.App.3d 994. In *Natter,* a rent control ordinance required that rent increases be calculated based on the rates charged on April 28, 1983. (*Id.* at p. 997.) However, guidelines to the ordinance specified that the base year for calculating rents was " 'calendar year 1982 or the most recent fiscal year ending on or prior to April 30, 1983.' " (*Id.* at p. 998.) The ordinance in *Natter* also established a procedure for a hardship rent increase if the base rent " 'was disproportionate due to [certain] enumerated factors.' " (*Id.* at p. 1002.)

The landlord in *Natter* sent notice to tenants in November 1982, indicating that their rent would be increased effective February 1983. In a subsequent hardship application, the landlord asserted that his base rate should be calculated by annualizing the rate in effect in April 1983. This position was rejected at the administrative and superior court levels. (190 Cal.App.3d at pp. 999-1001.)

The appellate court reversed, holding that the drafters of the rent control ordinance had "contemplated the annualization of rents in a case such as this" because the language of the hardship application guidelines gauged disproportionality by comparing rents charged at different times throughout the year "to the rent from a 'base date' rather than from a 'base year.' Further, owners were permitted to show the rent from a base date was disproportionate and not indicative of actual rent levels through a comparison with rents charged at other times during the year." (190 Cal.App.3d at p.

---

[11]" '[T]he expression of certain things in a statute necessarily involves exclusion of other things not expressed. . . .' [Citation.]" (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1391, fn. 13.)

1002.) The *Natter* court also observed that an interpretation permitting annualization would avoid the potential of the rent control ordinance operating in a confiscatory manner. (*Id.* at p. 1003; see also *Cotati Alliance for Better Housing* v. *City of Cotati* (1983) 148 Cal.App.3d 280, 285 [195 Cal.Rptr. 825].)

In contrast to *Natter*, the West Hollywood rent control scheme contains no language which would support annualization. Rather, the landlord is specifically required to calculate gross income based on actual receipts for 12 of the preceding 14 months. Moreover, the constitutional concerns in *Natter* regarding confiscation of property are not present in this case. Indeed, Abramson notes that she would not have bothered to pay a fee and file I-061 had she been put on notice that City would calculate her rental income by annualizing the MAR granted in I-048.[12]

City also relies on the example recited in Commission's resolution, quoted in footnote 8, *ante*, to support its argument in favor of annualization. The example merely begs the question. Regulation 60005(A)(4) permits a rent increase application to be filed not less than six months after the final disposition of a prior application. This is exactly what Abramson did. The fact that City's rent control scheme has unintentionally created the potential for undesirable duplicative rent increases does not provide a valid basis for the introduction of a new procedure which seeks to avoid this undesired effect.

We are mindful of the general rule that City's contemporaneous construction of Ordinance is entitled to great deference. We are also mindful of the policy arguments advanced by City throughout these proceedings regarding the protection of tenants from excessive increases in rent.[13] But no matter how great the deference or how strong the policy, we are unwilling to read a procedure into Ordinance which does not exist. (See *Vega* v. *City of West Hollywood* (1990) 223 Cal.App.3d 1342, 1350 [273 Cal.Rptr. 243].)

Based on the foregoing, we conclude that City's annualization of gross income in I-061 was not authorized and therefore should not be allowed to

---

[12]In her appeal to Commission, Abramson referred to an internal City document dated December 1988 which discussed rent increase applications which are filed less than one year after a previous application has been granted. The document stated that "[t]he City Council should announce the approach it favors so that the public knows in advance how this issue will be dealt with."

[13]Abramson, of course, asserts that her tenants were being charged unduly low rents during the long pendency of I-048.

stand. Accordingly, we shall order that I-061 be recalculated without annualization of the MAR granted in I-048. (See *Lindell Co. v. Board of Permit Appeals* (1943) 23 Cal.2d 303, 315 [144 P.2d 4].)[14]

*Other Issues**

. . . . . . . . . . . . . . . . . . . . . . . . . .

## Disposition

The judgment is reversed. The trial court is directed to issue a writ of mandate compelling City of West Hollywood, City of West Hollywood Rent Stabilization Department, and City of West Hollywood Rent Stabilization Commission to reconsider rent increase application No. I-061 in a manner consistent with the views expressed in this opinion; i.e., without annualizing the maximum allowable rent rates granted in rent increase application No. I-048 and utilizing 18.76 percent as the relevant increase in the consumer price index. Mayme Abramson is to recover her costs on appeal.

Ortega, J., and Vogel, J., concurred.

---

[14]If, upon recalculation, a rent increase is granted, section 6411(C)(1)(c) would permit Abramson to list the filing fee for her application to increase rent as an operating expense.

Moreover, City has aptly conceded that the relevant 60 percent increase in the CPI to which Abramson is entitled pursuant to section 6411(C)(1)(h) is 18.76 percent, rather than the 18.69 percent increase which resulted from mathematical error in I-061. The corrected figure of 18.76 percent should be utilized in recalculating I-061.

*See footnote, *ante*, page 1121.