[No. B200213. Second Dist., Div. Four. Dec. 19, 2008.]

JOHN SANDOVAL, Plaintiff and Appellant, v.
LOS ANGELES COUNTY DEPARTMENT OF PUBLIC SOCIAL
SERVICES, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*This opinion is certified for publication with the exception of parts A.2. and 3., B. and C. of the Discussion.

1168

1170

## COUNSEL

Akudinobi & Ikonte, Emmanuel C. Akudinobi and Chijioke O. Ikonte for Plaintiff and Appellant.

Gutierrez, Preciado & House, Calvin House and Ann D. Wu for Defendant and Respondent.

## OPINION

**MANELLA, J.**—In the underlying action, the trial court granted nonsuit on appellant John Sandoval's claim for violation of due process against respondent Los Angeles County Department of Public Social Services (DPSS). Following a jury verdict in favor of DPSS on Sandoval's remaining claims against DPSS for civil rights violations and wrongful termination, the trial court entered judgment for DPSS and denied Sandoval's motion for a new trial. We affirm.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. *Complaint*

Sandoval initiated the underlying action in January 2006. His complaint asserted claims against DPSS for retaliation (Gov. Code, § 12940, subd. (h); 42 U.S.C. § 1983), denial of due process (42 U.S.C. § 1983), disability discrimination (Gov. Code, § 12940, subd. (m)), wrongful termination in

violation of public policy, and intentional infliction of emotional distress.[1] The complaint alleged the following facts: DPSS hired Sandoval in 1991. After he complained in 1997 that a supervisor had sexually harassed a coworker, he was subjected to retaliation in the form of poor performance evaluations, reassignments, and false accusations of misconduct. In February 2001, DPSS improperly sought to reassign him, and he took a medical absence. While Sandoval was absent from work, DPSS discharged him. In January 2003, the civil service commission ruled that Sandoval be restored to his position, provided that he was fit to return to work, and that he established that he had properly claimed workers' compensation benefits. When Sandoval reported for work in June 2004, DPSS declined to reinstate him.

DPSS sought summary judgment or adjudication on the complaint, contending, inter alia, that Sandoval's claims failed because he had "automatically resigned" in October 2003 by failing to respond to three notices DPSS sent him in 2003, requesting him to appear for work. DPSS pointed to section 5.12.020, subdivision A.1 of the Los Angeles County Code, which provides that a county employee who "fails to discharge [h]is regularly assigned duties" for specified periods is "deemed to have resigned . . . ." The trial court granted summary adjudication on Sandoval's claims for disability discrimination and infliction of emotional distress, and otherwise denied DPSS's motion.

## B. *Evidence at Trial*

Trial by jury on Sandoval's remaining claims began on March 5, 2007.[2] Sandoval testified as follows: DPSS hired him in 1991 as an eligibility worker, charged with processing applications for welfare benefits. He worked hard, received commendations for his performance, and was eventually elected a union shop steward. In late 1997, he saw Roberto Del Valle, a supervisor, sexually harass a coworker, and complained to the manager of the DPSS human resources department, who encouraged Sandoval "to change [his] testimony." Sandoval nonetheless pursued the complaint about Del Valle, who was ultimately discharged.

In 1998, Priscilla Stallworth became the deputy district director responsible for Sandoval's section. Vicky Short, Sandoval's immediate supervisor, reported directly to Stallworth. When Stallworth reassigned Sandoval to a position he regarded as a demotion, he filed a grievance, and was not reassigned. Short told him she had been advised not to pick Sandoval as her

---

[1] The complaint also asserted a claim for conspiracy to interfere with civil rights against several DPSS employees (42 U.S.C. § 1985(3)). This claim was dismissed prior to trial.

[2] Prior to trial, Sandoval filed a first amended complaint that modified his claims in ways not material here.

"lead worker," and he also received a low score of 70 on an examination that determined his prospects for promotion. He appealed the score, which was readjusted to a score of 100.

According to Sandoval, he had no disciplinary record prior to July 2000, when Stallworth improperly charged him with delay in the processing of a file. In early February 2001, she improperly charged him with an unauthorized absence from his desk. He filed grievances regarding these charges, and suffered no discipline. On February 22, 2001, Stallworth notified him that he had been reassigned to a new unit. Sandoval filed a grievance regarding the reassignment, went on leave, and sought workers' compensation benefits, citing work-related emotional distress and physical pain he had experienced for several months.

While Sandoval was on leave, a coworker asked him to help her obtain an item of salary. When he met the coworker in the lobby of a DPSS building, he encountered Esther Martinez, a supervisor, who said he was not supposed to be there, and later falsely charged him with discourtesy. As a result, he received a seven-day suspension. In January 2002, DPSS discharged Sandoval on the ground that he had improperly asked a participant in a welfare benefits program to complete paperwork at a location outside DPSS offices. Sandoval appealed the discharge. In November 2002, a hearing officer of the civil service commission (Commission) filed a report recommending, inter alia, that Sandoval be accorded "conditional reinstatement . . . predicated upon [1] [his] prevailing in his Worker's Compensation appeals case, and [2] his being declared fit to return to work." On January 22, 2003, the Commission adopted the hearing officer's recommendation "to not sustain [DPSS] in the discharge and to make [Sandoval] whole."

While Sandoval was on leave, he lived with his parents on Randolph Avenue in Los Angeles (the Randolph address) until late 2001, on Copeland Street in Lynwood (the Copeland address) until late 2003, and thereafter on Occidental Boulevard in Los Angeles (the Occidental address). Sandoval acknowledged that DPSS employees were obliged to notify DPSS about changes in their address, but testified that this obligation attached only when they "were at work." According to Sandoval, he asked the attorney representing him in his action for workers' compensation benefits to notify DPSS of the changes in his address. He could not recall whether he personally contacted DPSS about the changes. Sandoval also acknowledged that he used his parents' Randolph address in connection with his claim for workers' compensation benefits, that checks for these benefits were sent to the Randolph address through June 21, 2004, and that after 2001 he continued to pick up his mail at that address.

In June 2004, Sandoval's claims for workers' compensation benefits were resolved in his favor. On June 23, 2004, he reported for work at DPSS, and was told he had been fired. He later learned that the termination rested on his failure to report for work in compliance with three notices (dated June 3, 2003, July 1, 2003, and Oct. 2, 2003), which had been sent to his parents' Randolph address. According to Sandoval, he never received the notices, even though he picked up mail at the Randolph address. In May 2005, Sandoval sought reinstatement by filing a petition for writ of mandate in the superior court, but his petition was dismissed for lack of prosecution.

At trial, Sandoval called Stallworth as a witness, who testified as follows: While she supervised Sandoval, she was unaware that he had complained about an incident of sexual harassment. As soon as she assumed responsibility for Sandoval's section, she heard complaints from clients about mistakes in his processing of their cases, and decided to transfer him to a position in which he was likely to make fewer errors. Sandoval appealed the reassignment to Stallworth's superior, who told her that Sandoval did not have to move. She charged Sandoval with insubordination in 2000, when she set a deadline for Sandoval to correct an error in one of his cases, and he failed to make a timely correction. She also charged him with unauthorized absences. Stallworth again tried to reassign Sandoval in 2001.[3]

In addition, Sandoval called Wendy Benson-Higgins. According to Benson-Higgins, she had been a manager in the DPSS department of investigative services since 1998. As such, she participated in the investigation of Sandoval's grievance regarding his examination score in 1998, and otherwise reviewed and signed paperwork arising out of other investigations regarding Sandoval. She could not recall the events surrounding the 1998 grievance, and had little direct involvement with Sandoval's other grievances and his January 2002 discharge.

Benson-Higgins testified that after the Commission's January 2003 decision, DPSS sent three notices in 2003 to Sandoval at the Randolph address, asking him to return to work. DPSS mailed the notices upon receiving information that the Commission's criteria for restoring Sandoval to his position had been satisfied: DPSS learned that Sandoval's workers' compensation claim had been effectively resolved, and that his doctors had released him. Each notice consisted of two identical letters, one sent by certified mail and the other by first-class mail. The certified copy of each notice was returned as unclaimed.

---

[3] Stallworth acknowledged that under the then applicable memorandum of understanding between DPSS and Sandoval's union, union stewards could be transferred over their objection only if no other employee met the qualifications for the vacant position. According to Stallworth, she complied with this requirement.

The first notice, dated June 3, 2003, informed Sandoval that DPSS had rescinded his January 2002 discharge, and asked him to report for work on June 10, 2003.[4] The second notice, dated July 1, 2003, noted Sandoval's failure to respond to the first notice, reaffirmed DPSS's decision to rescind his January 2002 discharge, and asked him to report for work. The second notice added: "If you fail to provide [DPSS] with a valid reason as to why you cannot report to work, further administrative action may be taken." The third notice, dated October 2, 2003, asserted that Sandoval, although twice directed to report for work, had "failed to do so without giving an explanation, and without any authorization." It further stated: "This letter is to inform you that if you do not report to work on or before October 7, 2003, [DPSS] will deem you to have resigned from your position . . . under Los Angeles County Codes 5.12.02[0] and 5.12.030 because of your unauthorized absence for more than three consecutive working days and failure to discharge your regularly assigned duties." The second and third notices state on their face that copies were also sent to the attorney who had represented Sandoval before the Commission.

Benson-Higgins acknowledged that she received a copy of the Commission's ruling regarding Sandoval's discharge on or after January 29, 2003, and that the certificate of mailing attached to the ruling listed the Copeland address for Sandoval. According to Benson-Higgins, DPSS policies required written notices to employees, and the Randolph address constituted Sandoval's "address on record" because it was the only address he had provided to DPSS.[5]

DPSS's principal witnesses were Patricia Barnard and Jacqueline Mallard, who testified regarding the procedures DPSS employs in sending certified letters. Mallard stated that her signature was on the certification form accompanying the October 2003 notice. She recalled that she took the notice to the post office and mailed it, but could not remember whether in mailing it she placed it in a mail bin or a mailbox.

---

[4] DPSS submitted the three notices into evidence.

[5] Sandoval presented several other witnesses. Ramona Almquist testified that in August 1998, she sent a letter to Roberto Del Valle informing him that he had been discharged. Vicky Short testified that while she supervised Sandoval, she had no disciplinary problems with him, and was satisfied with his work. When she asked Sandoval to become her lead worker, he agreed, but Stallworth advised her not to make him lead worker because Stallworth "needed someone [she] could work with." Esther Martinez testified that Sandoval refused to be reassigned in January 2001, even though his unit was being disbanded. She acknowledged that she encountered him in the lobby of a DPSS building in June 2001, and signed a letter to Sandoval in November 2001 stating DPSS's intent to discharge him. Joseph Ochoa testified that Sandoval had lived with him at the Occidental address since November 2003. Marco Tule testified that in June 2004, he accompanied Sandoval to a DPSS office, where Sandoval was told that he had been discharged. Cecilia Cisneros testified that when Sandoval came to her office in 2004, she told him that he had been discharged.

### C. *Judgment and New Trial Motion*

Following the presentation of evidence at trial, the trial court granted DPSS's motion for nonsuit on Sandoval's due process claim. After the jury returned a special verdict that Sandoval was lawfully deemed to have resigned from his position in October 2003, the trial court entered judgment in DPSS's favor on Sandoval's remaining claims, and denied his motion for a new trial. This appeal followed.

## DISCUSSION

Sandoval contends (1) that nonsuit was improper on his due process claim, (2) that the jury was misinstructed, (3) that the verdict form was defective, (4) that there was juror misconduct, and (5) that the trial court improperly declined to answer questions from the jury. These are the same contentions on which he based his motion for a new trial, which he asserts the trial court improperly denied.[6] As explained below, he has failed to show reversible error.

### A. *Resignation*

Sandoval's challenges to the jury instructions, special verdict form, and grant of nonsuit are closely tied to the provisions of the Los Angeles County Code[7] governing employee resignation (§ 5.12.020 et seq.). Section 5.12.020, subdivision A, provides that a county employee who "without prior authorization is absent or fails to discharge [h]is regularly assigned duties for either three consecutive regular working days or for two consecutive regularly scheduled on-duty shifts, whichever may be applicable, shall be deemed to have resigned effective as of the end of the day of [*sic*] which he last performed any of the duties of his position; provided, however, an officer or

---

[6] We therefore examine the contentions in light of the appropriate standard of review on appeal, and—when necessary—under the standard of review applicable to the denial of a new trial motion. Generally, the trial court's ruling on a new trial motion is reviewed for an abuse of discretion. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871–872 [135 Cal.Rptr. 647, 558 P.2d 545].) To the extent that the trial court confronted conflicting declarations in denying the new trial motion, we affirm the trial court's factual determinations, whether express or implied, if supported by substantial evidence. (*Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 507–508 & fn. 3 [90 Cal.Rptr.2d 502]; *DeWit v. Glazier* (1957) 149 Cal.App.2d 75, 82 [307 P.2d 1031].) Nonetheless, "it is our duty to review all rulings and proceedings involving the merits or affecting the judgment as substantially affecting the rights of a party . . . including an order denying a new trial. In our review of such order *denying* a new trial, as distinguished from an order *granting* a new trial, we must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial." (*City of Los Angeles v. Decker, supra*, 18 Cal.3d at p. 872, citation omitted.)

[7] All further references are to the Los Angeles County Code, unless otherwise indicated.

employee shall not be deemed to have so resigned if he resumes the performance of his regularly assigned duties at the commencement of his next regular working day or on-duty shift following the expiration of the aforementioned period of absence or failure to discharge duties."

Section 5.12.030, which is central to Sandoval's contentions, directs the county employer to provide an absent employee with a notice that his or her continued absence shall constitute a resignation, but provides that the employer's failure to give the notice does not, by itself, nullify the employee's resignation. Section 5.12.030 states: "When a county officer or employee, without prior authorization, is absent or fails to discharge his regularly assigned duties for such period of time that it appears likely he intends to resign pursuant to subsection A of Section 5.12.020, the appointing officer of such affected officer or employee shall serv[e] upon that officer or employee, either personally, by telegraph, or by first class mail addressed to the most recent address furnished to the appointed officer by the affected officer or employee, a notice in writing stating that failure of the officer or employee to resume the discharge of his duties on or before the commencement of the working day stated therein shall constitute such resignation. Said notice shall be posted, delivered personally, or delivered to the telegraph office at least 24 hours prior to the commencement of the working day specified in the notice. Failure to give such written notice shall not cause such resignation to be ineffective."[8]

### 1. *Nonsuit*

Sandoval contends that nonsuit was improper on his due process claim under 42 United States Code section 1983 (section 1983).[9] The crux of his claim—often called a *"Monell"* claim—was that DPSS, a department of Los Angeles County (the County), denied Sandoval due process in declining to

---

[8] The resignation provisions in the Los Angeles County Code accord an employee subject to this form of resignation opportunities to challenge the resignation. The employee may file a *written request for reinstatement within 20 days of the effective date of the resignation*, and seek reinstatement on the grounds of "good cause for the absence or failure to perform duties, such as bona fide illness, injury, or similar circumstances beyond the control of the officer or employee." (§ 5.12.020, subd. A.2.) In addition, the provisions state that "[n]othing . . . precludes any . . . employee from filing with the civil service commission, pursuant to its rules, a request for a hearing on the ground that his resignation . . . was obtained by the fraud, duress, or undue influence of the county." (§ 5.12.040.)

[9] Section 1983 of the United States Code provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

reinstate him pursuant to the January 2003 Commission decision when he reported for work in June 2004.[10]

■ Under United States Code section 1983, the County cannot be held liable for Sandoval's injuries in the absence of a "policy, official decision or custom." (*Ogborn v. City of Lancaster* (2002) 101 Cal.App.4th 448, 463 [124 Cal.Rptr.2d 238].) As our Supreme Court has explained, under section 1983, counties "cannot be held vicariously liable under section 1983 for their subordinate officers' unlawful acts, [but] may be held directly liable for constitutional violations carried out under their own regulations, policies, customs, or usages by persons having 'final policymaking authority' over the actions at issue." (*Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 829 [11 Cal.Rptr.3d 692, 87 P.3d 1].) Although the trial court granted nonsuit without explaining its ruling, in denying Sandoval's new trial motion the court stated that nonsuit was proper because Sandoval had "failed to present any evidence of an unconstitutional governmental custom or policy."[11] (Italics omitted.)

### a. *Custom or Policy*

Sandoval's principal contention is that section 5.12.030 is constitutionally infirm, and thus constitutes the requisite custom or policy. He argues that the final sentence of section 5.12.030 contravenes the due process rights of public employees to notice of a resignation through absence from work. For the reasons explained below, we disagree.

■ Under the United States Constitution, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations.] The notice must be of such nature

---

[10] Claims of this kind against municipalities originate with *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658 [56 L.Ed.2d 611, 98 S.Ct. 2018].

[11] " 'A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor.' [Citation.] In determining the sufficiency of the evidence, the trial court must not weigh the evidence or consider the credibility of the witnesses. Instead, it must interpret all of the evidence most favorably to the plaintiff's case and most strongly against the defendant, and must resolve all presumptions, inferences, conflicts, and doubts in favor of the plaintiff. If the plaintiff's claim is not supported by substantial evidence, then the defendant is entitled to a judgment as a matter of law, justifying the nonsuit. [Citation.]" (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541 [50 Cal.Rptr.2d 395], quoting *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].) We review rulings on motions for nonsuit de novo, applying the same standard that governs the trial court. (*Saunders v. Taylor, supra*, at pp. 1541–1542 & fn. 2.)

as reasonably to convey the required information [citation], and it must afford a reasonable time for those interested to make their appearance [citations]. But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met, the constitutional requirements are satisfied." (*Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314–315 [94 L.Ed. 865, 70 S.Ct. 652].)

In *Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1108 [278 Cal.Rptr. 346, 805 P.2d 300] (*Coleman*), our Supreme Court discussed the procedural protections that due process accords a public employee facing a discharge under Government Code section 19996.2, subdivision (a), which states that an employee's unauthorized five-day absence from work is an " 'automatic resignation.' "[12] Although the statute defines the absence as an "automatic resignation," the court reasoned that no absence becomes an actual resignation until "the state decides to invoke the statute." (*Coleman, supra*, 52 Cal.3d at p. 1117.) The court stated: "[B]efore [the state] can invoke the . . . statute, the state must make factual determinations; whether the employee has resigned under the . . . statute turns on the presence of the factual prerequisites for statutory resignation, namely, an absence that is for five consecutive working days and is without leave." (*Id.* at p. 1118.) The court thus distinguished between the factual basis for an automatic resignation, and the state's decision to assert that the requisite factual basis existed for an automatic resignation. (*Id.* at pp. 1118–1123.)

The court concluded: "[B]efore the state can treat [an] . . . employee's unexcused absence . . . as a constructive resignation under the . . . statute, it must give the employee written notice of the action contemplated. The notice must advise the employee of the facts supporting the state's invocation of the . . . statute. If the employee challenges the accuracy of the state's factual basis, the state must, as soon as practicable, give the employee an opportunity to present his or her version of the facts. To assure 'the appearance and

---

[12] Subdivision (a) of Government Code section 19996.2 provides: "Absence without leave, whether voluntary or involuntary, for five consecutive working days is an automatic resignation from state service, as of the last date on which the employee worked. [¶] A permanent or probationary employee may, within 90 days of the effective date of such separation, file a written request with the department for reinstatement; provided, that if the appointing power has notified the employee of his or her automatic resignation, any request for reinstatement must be made in writing and filed within 15 days of the service of notice of separation. Service of notice shall be made as provided in Section 18575 and is complete on mailing. Reinstatement may be granted only if the employee makes a satisfactory explanation to the department as to the cause of his or her absence and his or her failure to obtain leave therefor, and the department finds that he or she is ready, able, and willing to resume the discharge of the duties of his or her position or, if not, that he or she has obtained the consent of his or her appointing power to a leave of absence to commence upon reinstatement. [¶] An employee so reinstated shall not be paid salary for the period of his or her absence or separation or for any portion thereof."

reality of fairness' in the decisionmaking process [citation] and to protect against a potential misuse of the . . . statute, such an informal hearing must be before a neutral fact finder. Once the state has provided notice and an opportunity to respond, neither the federal nor the state Constitution requires anything more." (*Coleman, supra,* 52 Cal.3d at pp. 1122–1123.)

In so concluding, the court rejected the contention that Government Code section 19996.2, subdivision (a), is constitutionally infirm because it does not expressly accord these protections to employees. (*Coleman, supra,* 52 Cal.3d at p. 1123.) The court stated: "When, as here, the 'constitutional weakness' lies primarily in 'what the statute[] [has] omitted, not [in its] express terms,' the statute may properly be invoked so long as due process requirements are met." (*Ibid.,* quoting *Barber v. State Personnel Bd.* (1976) 18 Cal.3d 395, 403 [134 Cal.Rptr. 206, 556 P.2d 306].)

Sandoval argues that the final sentence of section 5.12.030 "says in essence that there is no need to comply with the notification requirement" of procedural due process before the employee is terminated. In our view, this contention is mistaken. In interpreting section 5.12.030, we look to the language of the provision, with an eye to harmonizing it with surrounding provisions and the state and federal Constitutions. (*Abramson v. City of West Hollywood* (1992) 7 Cal.App.4th 1121, 1126 [9 Cal.Rptr.2d 507].)

We begin by examining subdivision A of section 5.12.020, to which section 5.12.030 refers. Subdivision A provides that an employee who is absent for a three-day period and fails to return to work on the day following this period, "shall be deemed to have resigned." Although subdivision A does not use the term "automatic resignation," it defines a period of absence that effectively constitutes this form of resignation. In this respect, subdivision A, like the statute at issue in *Coleman,* characterizes the factual basis for an automatic resignation.

Section 5.12.030, which has no analogue in the statute addressed in *Coleman,* is not a model of clarity. The first sentence of the section directs the employer, upon determining that an employee has been absent without authorization "for such period of time that it appears likely he intends to resign pursuant to [§ 5.12.020, subd. A]," to send a notice to the employee stating that failure to return to work "on or before the commencement of the working day stated therein shall constitute *such* resignation." (§ 5.12.030, italics added.) The second sentence clarifies that the notice should be sent at least one full day "*prior* to the commencement of the working day specified in the notice." (*Ibid.,* italics added.) Taken together, the two sentences direct the employer to send a notice that effectively extends the period of unauthorized absence constituting an automatic resignation: Once the employee has been

absent without authorization for the period stated in subdivision A, the employer is required to send a notice setting a future date by which the employee must return to work.

We turn to the final sentence of section 5.12.030, which states that the employer's failure to give the specified notice does not render "such resignation . . . ineffective." The term "such resignation," on its face, is reasonably construed as referring to the period of unauthorized absence constituting an automatic resignation. Accordingly, the final sentence, viewed in context, provides that if the employer does not send a notice—and thus fails to extend the period of absence amounting to an automatic resignation—the three-day period of unauthorized absence defined in section 5.12.020, subdivision A constitutes the employee's automatic resignation. Simply put, the final sentence establishes the period of absence defined in subdivision A as the "default" period for the purpose of such a resignation. The rules stated in the first two sentences of section 5.12.030 are therefore properly regarded as "directory," rather than as "mandatory," as they specify conduct for the employer that is ultimately inessential (in the sense described above) for the existence of an automatic resignation.[13]

So understood, section 5.12.030 is not constitutionally infirm. As our Supreme Court clarified in *Coleman*, due process obliges the employer to provide the absent employee with notice and an opportunity to be heard *after* the employer has determined that the employee has, in fact, been absent for the period constituting a resignation: "[B]efore invoking the [automatic resignation] statute, the state necessarily had to determine that the absence was for the statutorily specified period and was without leave. Once the state has made these preliminary determinations, the requirements of written notice to the employee and an opportunity for a prompt response impose little additional burden on the state." (*Coleman, supra,* 52 Cal.3d at p. 1122.)

---

[13] "[A] ' "directory" or "mandatory" designation . . . denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates.' [Citation.] If the action is invalidated, the requirement will be termed 'mandatory.' If not, it is 'directory' only." (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1145 [43 Cal.Rptr.2d 693, 899 P.2d 79], quoting *Morris v. County of Marin* (1977) 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606].) Generally, "[t]here is no mechanical test for determining whether a provision should be given 'mandatory' or 'directory' effect. [Citation.] Rather, ' "[i]n order to determine whether a particular statutory provision . . . is mandatory or directory, the court, as in all cases of statutory construction and interpretation, must ascertain the legislative intent. In the absence of express language, the intent must be gathered from the terms of the statute construed as a whole, from the nature and character of the act to be done, and from the consequences which would follow the doing or failure to do the particular act at the required time. [Citation.] When the object is to subserve some public purpose, the provision may be held directory or mandatory as will best accomplish that purpose [citation]. . . ." ' [Citation.]" (*In re Lamonica H.* (1990) 220 Cal.App.3d 634, 642 [270 Cal.Rptr. 60], italics omitted.)

 The notice specified in section 5.12.030 is unrelated to the notice requirement of due process. As explained above, section 5.12.030 directs the employer to send a notice to the absent employee (1) to extend the period of unauthorized absence that constitutes an automatic resignation, and (2) to inform the employee about the extended period before it elapses. Under the final sentence of the provision, the employer's failure to send the notice fixes the three-day period defined in section 5.12.020, subdivision A as the operative period. The notice specified in section 5.12.030 is therefore intended solely to adjust the factual basis for an automatic resignation. Nothing in section 5.12.030—including the final sentence—purports to relieve the employer of the duty to provide the employee with notice and an opportunity to challenge the employer's factual determinations *after* the employer has found that the factual basis for a resignation exists, namely, that the employee has been absent for the pertinent period. (*Coleman, supra,* 52 Cal.3d at p. 1117.) Accordingly, because section 5.12.030 is silent about the protections required by due process, it cannot be viewed as constitutionally unsound.[14] (*Coleman,* at p. 1123.)

### b. *Official Decision*

Sandoval also contends that there is substantial evidence to support an alternative theory of liability under United States Code section 1983, namely, the existence of an "official decision" that violated his due process rights (*Ogborn v. City of Lancaster, supra,* 101 Cal.App.4th at p. 463). He argues that DPSS improperly decided not to reinstate him in June 2004, and that liability for this decision attaches to the County under principles of delegation of authority or ratification. The crux of this argument is that the 2003 notices regarding his reinstatement and potential termination were inadequate because DPSS sent them to his parents' Randolph address, and never tried to contact him in any other way.

 In *St. Louis v. Praprotnik* (1988) 485 U.S. 112, 122–123, 130 [99 L.Ed.2d 107, 108 S.Ct. 915] (*Praprotnik*), a plurality of the justices of the United States Supreme Court concluded that United States Code section 1983 liability may arise through the conduct of officials with policymaking power. The plurality stated: "[T]he identification of policymaking officials is not a question of federal law, and it is not a question of fact in the usual sense. The States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms. Among the many kinds of municipal corporations, political subdivisions, and special districts of all sorts, one may expect to find a rich variety

---

[14] Aside from the challenge to section 5.12.030, Sandoval does not argue that DPSS has a custom or policy of denying employees subject to automatic resignations the due process procedural protections we have explained, and thus has forfeited any such contention.

of ways in which the power of government is distributed among a host of different officials and official bodies." (485 U.S. at pp. 124–125.)

The plurality in *Praprotnik* further stated that a municipality may be liable for a subordinate's decision to terminate an employee if the municipality's authorized policymakers have delegated policymaking power regarding the decision to the subordinate, or some official with policymaking power has ratified the subordinate's decision. (*Praprotnik, supra,* 485 U.S. at pp. 123–124, 130.) In *Harman v. City and County of San Francisco* (2006) 136 Cal.App.4th 1279, 1296–1298 [39 Cal.Rptr.3d 589], the court concluded that United States Code section 1983 liability attaches through the delegation of authority only when an official's exercise of delegated authority involves the power to *make policy*: the discretionary power to hire or fire an employee is not, by itself, sufficient for municipal liability, "even though the decision maker may have a final power to make such decisions."

Sandoval contends that the record discloses substantial evidence (1) that the 2003 notices were not sent to his correct address; (2) that the County "operates through [a] delegation of powers"; and (3) that Bryce Yokamiso, DPSS's chief official, ratified the decision to discharge him. In support of items (2) and (3), Sandoval points to testimony from Wendy Benson-Higgins, who testified that her superior, David Miyashita, decided to terminate Sandoval, and that Miyashita received the authority to make this decision from Yokamiso, the director of DPSS; in addition, Benson-Higgins testified that she "ratified" Miyashita's decision in enforcing it in June 2004, when Sandoval reported for work.

In our view, this evidence is insufficient to establish liability under United States Code section 1983 on theories of delegation or ratification. Under California law, the county's board of supervisors is authorized to promulgate rules and policies regarding County employees. (*Marcario v. County of Orange* (2007) 155 Cal.App.4th 397, 406 [65 Cal.Rptr.3d 903].) Nothing in Benson-Higgins's testimony suggests that the board of supervisors delegated its policymaking authority to Yokamiso (or his subordinates) or itself ratified Sandoval's termination. Nonsuit was therefore proper on Sandoval's due process claim under section 1983.

2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1167.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs on appeal.

Epstein, P. J., and Suzukawa, J., concurred.

A petition for a rehearing was denied January 6, 2009, and appellant's petition for review by the Supreme Court was denied March 25, 2009, S170098.

---

*See footnote, *ante*, page 1167.