Filed 3/4/13  Liu v. Sun CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JUNWEI LIU,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>JING SUN et al.,<br><br>    Defendants and Respondents. | B236305<br><br>(Los Angeles County<br>Super. Ct. No. KC053835)<br><br>ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on February 15, 2013, be modified as follows:

On page 13, the first paragraph, beginning "Liu argues that" is deleted and the following paragraph is inserted in its place:

Liu argues that Unity and Sun "ratified" his conversion of these funds by issuing 1099-MISC tax forms which listed payments to Liu as "Non-Employee Compensation."  Liu, however, did not introduce these tax forms into evidence or make this argument at trial.  Although Liu attached the forms to declarations supporting (1) a pre-trial motion regarding miscellaneous accounting and tax issues he filed in March of 2010 and (2) his motion for new trial, he did not make his ratification argument in either motion.  Liu thus forfeited the argument on appeal.  (*Kaufman v.*

1

*Broad communities, Inc. v. Performance Plastering, Inc.* (2006) 136 Cal.App.4th 212, 226 (*Kaufman*).)  Moreover, even assuming the argument was not forfeited, we reject it on the merits.  Liu cites no legal authority—and we have found none—to support his argument.  The issue is whether *at the time Liu took the money*, he committed conversion.  However Sun, Unity or their accountant subsequently classified Liu's withdrawals for tax purposes makes no difference with respect to whether Liu committed conversion.

There is no change in the judgment.

Filed 2/15/13  Liu v. Sun CA2/3 (unmodifed version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JUNWEI LIU, | B236305 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. KC053835) |
| v. | |
| JING SUN et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert A. Dukes, Judge.  Affirmed.

Jeanne Collachia for Plaintiff and Appellant.

King, Cheng & Miller, Katharine A. Miller and David P. King for Defendants and Respondents.

_____

1

## INTRODUCTION

Plaintiff and cross-defendant Junwei Liu appeals a judgment entered against him and in favor of defendants and cross-complainants Jing Sun and Unity Professional Insurance Services, Inc. (Unity) after a bench trial. Liu and Sun formed JSL Insurance Solutions, Inc. (JSL) as a company engaged in the insurance sales business. Unfortunately, Liu and Sun had many disputes regarding the operation of JSL and Unity, Sun's wholly owned company. In their pleadings, both sides asserted numerous direct claims against each other, as well as derivative claims on behalf of JSL.[1]

At trial the two sides presented evidence regarding two very different versions of events which led to this action. The trial court found Liu's testimony not credible and Sun's testimony credible, and then entered a statement of decision and judgment in favor of Sun and Unity. We affirm.

## FACTUTAL AND PROCEDURAL BACKGROUND

1.    *The Formation of JSL*

In February 2007, Liu and Sun met at a seminar where Sun was a speaker. At the time, Liu was working as a manager at Prudential Financial Planning Services (Prudential). Sun operated Unity. Both Liu and Sun were licensed insurance brokers and agents.

According to Sun, Liu solicited her to go into business with him. Sun and Liu discussed the matter numerous times in the spring and summer of 2007. Liu repeatedly told Sun that he had many high-net-worth clients at Prudential, that he managed 30 or 40 agents there, and that he had extensive experience recruiting and training agents. Sun was interested in going into business with Liu because of the clients and agents he could bring with him from Prudential and because he was an experienced recruiter and trainer.

---

[1]    JSL was named as a nominal defendant in both Liu's second amended complaint and the verified cross-complaint of Sun and Unity. The company is not a party to this appeal.

Sun offered to sell 50 percent of Unity for $125,000. Liu, however, declined this offer because he did not have sufficient resources.

Eventually Sun and Liu decided to form a new company. They contemplated their new company would be general agent, that is, an insurance wholesaler which has contracts directly with insurers and "downline" agents. Unity, by contrast, was an insurance retailer, which sold insurance directly to customers but did not have contracts with insurers. As a general agent, a company can make commissions by selling insurance directly to customers, as well as "overrides" on commissions earned by its downline agents.

In August or September 2007, Sun and Liu entered into an oral agreement regarding their contemplated company. While Sun and Liu do not dispute many of the terms of this agreement, they do dispute the terms relating to Unity. Liu contends Sun agreed to "close down" Unity. Sun contends the parties agreed Unity could keep its existing clients and downline agents, and that all new clients and agents would belong to the newly formed company.

On September 11, 2007, Liu and Sun incorporated JSL and appointed themselves the officers and directors of the company. At about the time JSL was formed, Liu and Sun each contributed $20,000 in cash to the company, which was placed in a bank account held by JSL. Both Liu and Sun were 50 percent shareholders of JSL.

JSL operated out of an office leased by Unity. It also used the furniture and equipment owned by Unity. According to Sun, Liu agreed that JSL would pay Unity $28,800 for the furniture and equipment once it had the revenues to make this payment. Liu contends that they agreed JSL could purchase Unity in its entirety for $28,800.

2.    *Liu's Termination from His Position at Prudential*

From June to October 2007, Liu's boss at Prudential, Jay Skolnick, wrote a series of letters to him regarding his alleged poor work performance and failure to address Prudential's concerns. In the final letter, dated October 4, 2007, Skolnick advised Liu he

was terminated immediately. According to Sun, she did not know of Prudential's concerns about Liu's performance before she agreed to form JSL with him.

### 3. *JSL's AIG and ING Contracts*

Beginning in October 2007, JSL sought to obtain general agency contracts with two large insurers, AIG and ING. These contracts were critical for JSL because it could not do any business in its own name without them. While JSL was negotiating with AIG and ING, JSL made sales "through" Unity. Sun contends that the commissions Unity earned were paid to JSL. In January 2008, JSL obtained general agency contracts with AIG and ING.

### 4. *Liu's Withdrawal of $39,000 in April 2008*

At the end of March 2008, Liu submitted an application on behalf of a customer named Zhou to purchase an AIG life insurance policy. Sun met Zhou before Zhou's application was submitted. Although she thought Zhou was trustworthy because she was introduced to Zhou by Liu, she was struck by how few questions Zhou asked about the insurance policy and how little attention Zhou seemed to pay to the matter.

On April 2, 2008, AIG transferred $39,070.24 into JSL's bank account. This payment was for the $38,366.77 commission JSL earned on Zhou's policy, plus commissions for a number of other much smaller sales. Within hours after JSL received the payment from AIG, Liu withdrew $39,000 from the JSL account.

Liu did not inform Sun of this withdrawal. Sun nevertheless learned about the withdrawal on the same day because she checked the JSL account balance on line. Sun was "shocked" by the withdrawal. She was also concerned that JSL could not pay its bills because there was not enough money in its account. Sun called Liu about the matter, and he admitted to taking the money.

### 5. *The Second Agreement*

Both Sun and Liu agree that they entered into a new oral agreement regarding their business in April 2008. They tell, however, different tales about that agreement.

4

Under Sun's version, she and Liu had meetings regarding Liu's withdrawal of $39,000 and the future of JSL on or about April 3 and 7, 2008. During those meetings, Sun indicated she did not want to do business with Liu anymore. Liu accused Sun of wrongfully diverting commissions belonging to JSL to Unity. After Sun reviewed with Liu the records regarding the commissions, however, Liu conceded that she had not done so. Liu also admitted he was "wrong" to pay himself $39,000, and promised he would return the money as soon as possible. However, because Liu stated he needed the money to take care of his family, Sun didn't insist that Liu return the money immediately.[2]

Liu convinced Sun to stay in business with him. He also agreed to purchase a 50 percent interest in Unity from Sun for $150,000. Liu persuaded Sun to maintain her business relationship with him by, inter alia, stating it was "very likely" JSL would earn a multi-million dollar commission from the sale of a $50 million AIG life insurance policy to Frank Hu. Hu was a friend of Liu and a former Prudential customer. In April of 2008, Hu's application was still pending. If JSL earned the large commission from Hu's policy, Liu could easily purchase 50 percent of Unity with his share of the commission.

Liu's contentions regarding the parties' second oral agreement are very different. He denies that he had a meeting with Sun regarding his $39,000 withdrawal, which he claims was legitimate. Rather, Liu contends, he and Sun had a meeting to discuss his discovery that Sun had not closed down Unity. Liu also contends Sun admitted she and Unity wrongfully took commissions, overrides and bonuses that belonged to JSL. Sun allegedly agreed to close down Unity and to repay the funds she and Unity wrongfully took.

It is undisputed that pursuant to the parties' second oral agreement, Liu was added as a signatory to several of Unity's bank accounts. Sun contends Liu was not an "owner" of the accounts.

---

[2] Sun testified that Liu said he need the money "for the families and stuff. So I [Sun] didn't really push that hard. I say, you know, you [Liu] have to return the money, but I didn't say the second day or third day."

5

6.      *Unity's and Sun's Loans to JSL*

After Liu's withdrawal of $39,000, there was only $100 left in JSL's bank account.  Unity thus paid JSL's expenses that were due in April 2008.  These payments constituted  a "loan" to JSL.  Because JSL had a negative cash flow, Sun also made loans to JSL in May, June and July 2008.  According to Sun, she authorized these loans in reliance on Liu's promise to purchase 50 percent of Unity.

7.      *The Cancellation of Zhou's Life Insurance Policy and AIG's Termination of Its Contract with JSL*

Under AIG's policy terms, customers have a 10-day "free look" period during which they can cancel their policy and receive a full refund of premium.  According to Sun, Zhou's AIG life insurance policy was never "delivered" to Zhou by Liu.  Instead, during the free look period, Zhou cancelled the policy.  AIG thus demanded JSL return its $38,366.77 commission.  Under its contract with AIG, JSL was required to immediately do so.  JSL, however, did not have sufficient funds to pay back the entire amount at once.  AIG thus ultimately terminated its general agency contract with JSL.

8.      *The Deterioration in the Relationship Between Liu and Sun, and Liu's Withdrawals from JSL and Unity Bank Accounts in August 2008*

After entering into a second oral agreement with Liu, Sun worked with Hu on his pending life insurance application.  One issue was obtaining a $3.4 million loan to fund the premium on the policy  In order to obtain the loan, Hu needed to produce certain financial documents.  He also needed to obtain a letter from a certified public accountant (CPA) regarding his financial condition.  Unfortunately, there were many delays. Hu never obtained the necessary letter from a CPA.  By June 2008, Sun suspected there were serious problems with Hu's case.  Hu's application was apparently never approved.

Sun was also frustrated by Liu's failure to pay her $150,000 for 50 percent of Unity, as he allegedly promised.  At some point, she advised Liu that he needed to pay the full amount due by the end of July 2008.  On August 6, 2008, Sun advised Liu that she was going to end her business relationship with him as of August 7, 2008.  According to Sun, Liu was "very, very mad" about this development.  On August 7, 2008, Sun paid JSL's employee and told the employee not to come back to work.

On August 14, 2008, within a few hours, Liu withdrew all of the funds from five different bank accounts.  First, he withdrew $512.24 out of JSL's Bank of America account, leaving a zero balance.  Next, he made withdrawals in the amounts of $128.16 and $3,745.12, for a total of $3,873.28, from Sun's two Citibank accounts, closing out both accounts.  Finally, he withdrew $10,275.23 from Unity's Comerica Bank account and $77.12 from JSL's Comerica Bank account, leaving a zero balance in both accounts.  Shortly thereafter, on the same day, Liu charged $112.18 on JSL's American Express card to pay for food and alcoholic beverages at a restaurant in Malibu.

Sun also contends that in August 2008, Liu misappropriated two computers from JSL.  Additionally, Sun contends Liu received $500 in cash from a broker-dealer named Wei Luo, which belonged to JSL.  Liu allegedly never paid that money to JSL.

9.  *Dissolution of JSL*

On August 14, 2008—the same day Liu was cleaning out JSL's and Unity's bank accounts and apparently celebrating in Malibu—Sun went to an attorney seeking assistance drafting a notice to Liu of a special shareholders' meeting of JSL.  The next day, August 15, 2008, Sun personally served the notice on Liu.

The meeting occurred on August 26, 2008.  Liu did not attend.  At the meeting, Sun voted to dissolve JSL.

10. *Pleadings*

In September 2008, Liu filed his initial complaint in this action. Liu's operative pleading, the second amended complaint (SAC), set forth causes of action for breach of contract, conversion, breach of fiduciary duty, fraud, constructive trust and unfair competition against Sun and Unity. The SAC set forth claims on behalf of Liu individually, as well as derivative claims on behalf of JSL. The gravamen of the SAC is that Sun breached her contract with Liu, and Sun and Unity committed various torts by transferring new agents recruited by JSL to Unity and by diverting commissions from JSL to Unity.

Sun and Unity filed a verified cross-complaint against Liu, wherein they pursued individual and derivative claims on behalf of JSL. The cross-complaint set forth causes of action for breach of oral contract, fraudulent inducement into contractual relationship, conversion, and breach of fiduciary duty. In addition to compensatory and punitive damages, the cross-complaint prayed for injunctive relief, the involuntary dissolution of JSL, an accounting and a constructive trust.

11. *Trial*

The superior court held a bench trial on the SAC and cross-complaint in late August and early September 2010. At the end of the trial, the court orally announced its findings, most of which were in favor of Sun and Unity. The court also asked the parties to meet and confer regarding the appointment of a person to conduct an accounting of JSL's finances so that the corporation could be dissolved and wound up.

12. *Statement of Decision*

Shortly after trial, Liu requested a written statement of decision from the court. Pursuant to the court's order, Sun and Unity prepared a proposed statement of decision. Liu filed objections to the proposed statement. On November 29, 2010, the trial court entered the statement of decision proposed by Sun and Unity.

The statement of decision provided as follows. For numerous reasons, the court found Liu was not credible and Sun was credible. The court ruled against Liu on all of his causes of action. It also found that under the agreement between the parties, Unity could continue operating with its preexisting business.

Although the court found that Liu did not breach his contract with Sun, it also found that Liu fraudulently induced Sun to enter into a second agreement with him. Specifically, the court found that Liu fraudulently promised he would purchase Unity "without expecting or intending to perform, with the intention instead of gaining access to funds in accounts that belonged to Sun and Unity and that Liu did indeed thereby gain access and raided those accounts." The court further found that "Hu was an illusory insured and the process of applying for insurance for Hu was a set-up by Liu for the purpose of Liu being able to raid JSL's accounts." However, the court did not find this fraudulent inducement by clear and convincing evidence, and thus concluded that punitive damages were not awardable to Sun.

The court found in Sun's favor on her three conversion causes of action. It found that each of Liu's withdrawals on August 14, 2008 and his payment to himself of $39,000 in April 2008, constituted conversion. The court also found that Zhou was an illusory insured Liu used to set-up his misappropriation of $39,000 in commissions, and that this was the same scheme "as he was setting up and acting upon with respect to Hu."

Additionally, the court found that Liu breached his fiduciary duties to both JSL and Sun by, inter alia, converting JSL's funds. This forced Sun and Unity to loan JSL funds which they did not recover.

The court concluded by stating JSL shall be dissolved "upon the winding up and an accounting of its assets and liabilities"; that JSL's liabilities included a loan from Sun in the amount of $19,743.67 and a loan from Unity in the amount of $20,583.01; that Liu personally is holding a trust in the amount of $39,512.24 for the benefit of JSL, $10,275.53 for the benefit of Unity, and $3,950.28 for the benefit of Sun.

9

13. *Motion for New Trial*

On April 29, 2011, Liu filed a motion for a new trial on the grounds that (1) there was an irregularity of the proceedings, (2) newly discovered evidence justified a new trial, (3) damages were excessive, (4) there was insufficient evidence to support the court's findings, and (5) the court's decision was contrary to law. This motion was based on Code of Civil Procedure section 657, subdivisions 1, 4, 5, 6 and 7. The motion was *not* based on an alleged "accident or surprise" pursuant to Code of Civil Procedure section 657, subdivision 3. On June 13, 2011, the trial court denied the motion on the merits.

14. *Report by Accountant-Referee*

Pursuant to Code of Civil Procedure sections 638 and 639, the court appointed Timothy Thompson as an accountant and referee to perform the final accounting of JSL, and to prepare the company's tax returns. In June 2011, Thompson filed a report on JSL, as well as draft tax returns. In July 2011, the trial court approved the report.

15. *Second Motion for New Trial*

On August 2, 2011, Liu filed a notice of motion and motion for new trial. This second motion for new trial was based on numerous grounds, including Liu's contention that there was an "accident or surprise" within the meaning of Code of Civil Procedure section 657, subdivision 3. On August 30, 2011, the trial court denied the motion.

16. *Judgment and Appeal*

On August 30, 2011, the trial court entered judgment in favor of Sun and Unity and against Liu. Based on the statement of decision and Thompson's accounting, the judgment awarded the cross-complainants damages and constructive trusts against Liu, dissolved JSL, and required Sun and Liu to make certain payments to third-party creditors of JSL. Liu filed a timely notice of appeal of the judgment.

## DISCUSSION

1.  *Sun Did Not "Ratify" Liu's Conversion of $39,000*

" 'The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages.' " (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 451.) "Money can be the subject of an action for conversion if a specific sum capable of identification is involved." (*Id.* at p. 452.)

Here, the trial court ruled in Sun's favor on her derivative claim for conversion against Liu. The court expressly and impliedly found that on April 2, 2008, Liu withdrew $39,000 from JSL's Bank of America account without Sun's consent or knowledge, leaving JSL without funds to pay its expenses and liabilities. There was substantial evidence to support these findings, namely documents relating to the Bank of America account, including the actual check Liu wrote to himself, and the testimony of Sun and Liu. Based on its factual findings, the trial court could have reasonably concluded that each of the elements of conversion were satisfied.

Liu contends that Sun "ratified" his wrongful taking of $39,000 of JSL funds during conversations she had with him shortly after he took the money. The testimony Liu cites, however, does not support his argument. Sun testified that she told Liu he had to "return the money," but he did not have to do so immediately. This testimony does not show that Sun gave her consent to Liu's conversion before or after he misappropriated $39,000 from JSL. It merely shows that Sun granted Liu leniency in making amends for his tortious conduct.

Liu's reliance on *French v. Smith Booth Usher Co.* (1942) 56 Cal.App.2d 23 (*French*) is misplaced. In *French*, the plaintiff purchased equipment from the defendant pursuant to an installment contract. Under the terms of the agreement, the defendant could take the equipment back if the plaintiff failed to make the payments due. When the plaintiff advised the defendant he could not make a scheduled payment, the defendant's representative said, " 'Then, according to our agreement, it will be necessary for us to come and get the equipment,' to which plaintiff responded 'All right.' " (*Id.* at p. 27.)

11

The present case is distinguishable from *French* because Sun did not expressly authorize Liu to take JSL's funds before he did so.

Liu also cites *Farrington v. A. Teichert & Son* (1943) 59 Cal.App.2d 468 (*Farrington*) to support his position.  In *Farrington*, the defendant was removing rock, sand and gravel from a remote area it believed belonged to the City of Los Angeles, which gave the defendant permission to do so.  When the plaintiff first noticed the defendant's operations, he did not object.  (*Id.* at p. 471.)  At some point, the plaintiff suspected that the defendant was removing some materials from plaintiff's property.  When the plaintiff and defendant discussed the matter, the plaintiff stated he wanted to be compensated the reasonable value of any material removed from his land.  At no time, however, did the plaintiff ask the defendant to cease excavating from the gravel pit in question.  (*Id.* at p. 472.)  The present case is clearly distinguishable from *Farrington*. Sun never gave Liu her tacit or express permission to withdraw $39,000 from JSL's Bank of America account.

2.      *Liu Did Not Show That Sun and Unity Ratified His Conversion of Money in Their Bank Accounts*

The trial court found that Liu converted $10,275.53 from Unity's Comerica Bank account and $3,950.28[3] from Sun's accounts at Citibank and Comerica Bank by withdrawing all of the funds in those accounts on August 14, 2008, without Unity's or Sun's permission.  There was substantial evidence to support these findings, including bank statements and related documents and the testimony of Sun and Liu.

---

[3]      This sum is apparently based on Liu's withdrawals of $128.16 and $3745.12 from Sun's Citibank accounts, plus his withdrawal of $77.12 from Sun's Comerica Bank account.  The court apparently underestimated the total by about $0.12.

Liu argues that Unity and Sun "ratified" his conversion of these funds by issuing 1099-MISC tax forms which listed payments to Liu as "Non-Employee Compensation." Liu, however, did not introduce these tax forms into evidence or make this argument at trial. Instead, Liu attached the forms to a declaration supporting a pre-trial motion regarding miscellaneous accounting and tax issues he filed in March of 2010 (tax motion)[4] and to a declaration supporting the second motion for new trial he filed in August 2011. We cannot, however, consider the 1099-MISC form filed with the tax motion because Liu did not raise his ratification argument in that motion, and thus forfeited the argument on appeal. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2006) 136 Cal.App.4th 212, 226 (*Kaufman*).) We also cannot consider the 1099-MISC form filed with the second motion for new trial because, as we explain *post*, the trial court did not have jurisdiction to consider the motion. Liu thus did not meet his burden of showing that Unity and Sun "ratified" his conversion of funds in their bank accounts by issuing tax forms.

3. *The Trial Court Was Not Required to Reject Sun's Fraudulent Inducement Claim as a Matter of Law*

Liu argues that as a matter of law he did not fraudulently induce Sun into entering into the second oral agreement. He first contends that the finding in the written statement of decision that Frank Hu was a "straw man" was not in conformity with the oral statements the court made at the end of trial, and thus should be disregarded. Liu cites no legal authority to support his position because there is none. The trial court's oral statements during trial were superseded by its statement of decision, and cannot be considered as the basis for an appeal. (*In re Marriage of Ackerman* (2006)

---

[4] This motion was for an order directing Sun, by April 30, 2010, to "(1) File Statement of Information for JSL Insurance Solutions, Inc. and Pay $663.00 to California Franchise Tax Board; (2) Cooperate with Plaintiff to File Tax Returns for JSL Insurance Solutions, Inc. for the Years 2008 and 2009;[ and] (3) To Correct/Cancel Form 1099s Defendant Issued to JSL Solutions, Inc. and Plaintiff Junwei Liu." The trial court denied this motion on or about April 28, 2010.

13

146 Cal.App.4th 191, 203 ["We review the result, not the trial court's reasoning, and do not consider comments by the trial judge"]; *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1451 ["Because we review the correctness of the order, and not the court's reasons, we will not consider the court's oral comments or use them to undermine the order ultimately entered"]; *Selfridge v. Carnation Co.* (1962) 200 Cal.App.2d 245, 249 ["oral opinions or statements of the court may not be considered to reverse or impeach the final decision of the court which is conclusively merged in its findings and judgment"]; *Birch v. Mahaney* (1955) 137 Cal.App.2d 584, 588 ["remarks made by a trial judge during a trial or argument, or even an opinion filed by him, cannot be used to impeach a formal decision, order or judgment later made or entered"].)

Liu also argues that his alleged misrepresentations about Hu were not actionable because they related to future events, not existing or past facts. He further argues that Sun could not have justifiably relied on Liu's promise that JSL would obtain a large commission if Hu obtained a life insurance policy because she knew of facts that reduced the probability that Hu would obtain such a policy. Both of these arguments miss the mark.

Liu's arguments assume the trial court's ruling on Sun's fraudulent inducement cause of action was based solely on its findings regarding Liu's misrepresentations concerning Hu's policy. This is simply not true. The trial court also found that Liu never intended to keep his promise to pay Sun $150,000 for a 50 percent interest in Unity, and that Sun spent money in reliance on this false promise. There was ample circumstantial evidence to support these findings, including Sun's testimony regarding Liu's statements and conduct, both before and after the second oral agreement, and her expenditures after Liu's false promise. Moreover, the trial court's factual findings regarding Liu's false promise to pay Sun $150,000 support a fraud cause of action. (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 158-159 [A false promise to perform in the future is actionable fraud].)

14

4. *Liu Did Not Meet His Burden of Showing the Citibank Accounts Were Jointly Owned by Liu and Sun*

In its statement of decision, the trial court found that Liu converted $3,950.28 in "Sun's [Citibank] accounts." Although Liu's argument is difficult to follow, it appears he contends that the trial court erroneously found that these accounts were solely owned by Sun, and that the trial court should have concluded that the accounts were jointly owned by Sun and Liu.

Liu argues that the "Citibank account" was held jointly by Sun and Liu because it is the "account where Fortune Securities commission checks were deposited." JSL and Fortune Securities, Inc. (Fortune Securities) had a referral agreement whereby Fortune Securities would pay JSL commissions on the sale of Fortune Securities' financial products to third-party customers. Liu contends that the trial court erroneously concluded that Sun owned the "Citibank account" based on its erroneous determination that the agreement between Fortune Securities and JSL was "illegal."[5]

We reject Liu's argument. The portion of the statement of decision relating to conversion does not make any findings regarding Fortune Securities, or even mention the company or its agreement with JSL. Thus there is no basis for Liu's assumption that the trial court made some sort of erroneous finding regarding the legality of the referral agreement.

Moreover, the only evidence Liu cited to support his argument are documents that show deposits made into Citibank account number 40045256720 by Liu and Sun. This was the account from which Liu converted $128.16. The documents do not show any deposits in Citibank account number 40045256738, which was the account from which Liu converted $3,745.12. Further, the documents do not show that the deposits were *Fortune Securities commission checks*, as Liu contends. Liu therefore cited no evidence in the record to support his argument that he was a joint owner of the Citibank accounts.

---

[5] Sun testified at trial that she believed the referral agreement was "illegal" because JSL had no broker-dealer license.

15

5.    *The Trial Court's Alleged Erroneous Admission of Character Evidence*

Liu contends that the trial court erroneously admitted evidence regarding his alleged failure at Prudential to properly train and supervise agents who violated the company's policy against money laundering. This evidence, Liu argues, was character evidence barred by Evidence Code section 1101, subdivision (a).[6] We shall analyze Liu's argument by reviewing the evidence regarding money laundering and the context of its admission.

Liu called himself as the first witness at trial. He testified extensively about his numerous professional achievements at Prudential and other companies, including the many awards he received. Several times the court asked why this information was relevant, to which Liu's counsel responded he wanted to prove Liu's "background." Sun's counsel agreed that the testimony was relevant because Sun alleged that Liu defrauded her by lying about his credentials at Prudential.[7]

During cross-examination, Sun's counsel David King asked Liu questions about a series of letters Liu received in 2007 from Jay Skolnick, his boss at Prudential. The letters were dated June 12, July 19, September 14, August 27 and October 4, 2007. King first asked Liu questions about the letter dated July 19, 2007, which dealt mainly with Liu's alleged poor performance at Prudential. This letter did *not* state anything about alleged money laundering, and King's questions regarding the letter did *not* concern the issue of money laundering.

---

[6]    Evidence Code section 1101, subdivision (a) provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

[7]    Sun alleged in her cross-complaint that Liu had no intention of keeping his promise to bring clients and agents from Prudential and that Liu knew he could not keep this promise.

At one point during King's questioning regarding the July 19, 2007, letter, Liu's counsel made the following objection: "Objection on the ground that this whole line of questioning is trying to elicit the information about the witness's character . . . ." The court overruled this objection.

Subsequently, King asked Liu a series of questions about Skolnick's letter dated August 27, 2007. This letter also primarily dealt with Liu's alleged poor performance at Prudential. The letter discussed, inter alia, Liu's alleged failure to properly train and supervise former agents concerning Prudential's policies to prevent money laundering. King asked Liu several questions about the money laundering allegations. Liu's counsel, however, did not object to any of these questions, or the admission into evidence of the August 27, 2007, letter.

We cannot reverse a judgment on appeal based on the erroneous admission of evidence unless a timely objection was made to the evidence. (Evid. Code, § 353, subd. (a).) In this case, Liu did not make a timely objection to the evidence concerning money laundering. He thus forfeited on appeal any claim of error regarding the admission of such evidence.[8] (*SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 563.)

To the extent Liu relies on his objection to the "line of questioning" regarding the letter dated July 19, 2007, we review the court's ruling for abuse of discretion. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) The line of questioning related to Liu's alleged poor performance at Prudential. This evidence was admissible to impeach Liu's own testimony regarding his work performance, as well as Liu's credibility. (Evid. Code, § 785 [credibility of a witnesses may be attacked], § 1101, subd. (c) [Evidence Code

---

[8] We also cannot reverse a judgment based on the erroneous admission of evidence unless there was a miscarriage of justice. (Evid. Code, § 353, subd. (b).) In its statement of decision, the court stated that one of the many reasons it did not find Liu credible was that he was terminated from Prudential "under allegations of money laundering . . . ." Because we conclude Liu failed to preserve his objection on appeal, we do not reach the issue of whether there was a miscarriage of justice.

17

section 1101 does not affect the admissibility of evidence to attack the credibility of a witness].)  We therefore conclude the trial court did not abuse its discretion in overruling Liu's objection to the line of questioning regarding the July 19, 2007, letter.

  6.     *The Trial Court's Denial of Liu's Motions for New Trial*

       a.     *Standard of Review*

Liu argues that the trial court erroneously denied his motions for new trial. Generally, we review an order denying a motion for new trial for abuse of discretion. [9] (*Sandoval v. Los Angeles County Dept. of Public Social Services* (2008) 169 Cal.App.4th 1167, 1176, fn. 6.)  "To the extent that the trial court confronted conflicting declarations in denying the new trial motion, we affirm the trial court's factual determinations, whether express or implied, if supported by substantial evidence." (*Ibid.*)  If we find the trial court abused its discretion in denying the motion, we independently review whether the court's error was prejudicial.  (*Ibid.*; accord, *Nazari v. Ayrapetyan* (2009) 171 Cal.App.4th 690, 694.)

       b.     *Liu's Second Motion for New Trial*

A trial court does not have jurisdiction to vacate a final order denying a motion for new trial, regularly made, except for clerical error or to grant relief under Code of Civil Procedure section 473.  (*Wenzoski v. Central Banking System, Inc.* (1987) 43 Cal.3d 539, 542; *Bloomquist v. Haley* (1928) 204 Cal. 258, 260; *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 901.)  Here, there is no evidence in the record that the trial court's order denying Liu's first motion for new trial was the result of clerical error, and there were no grounds under which to vacate the order pursuant to Code of Civil Procedure section 473.  Indeed, in the trial court, Liu did not attempt to vacate the order and did not argue there was any clerical error or mistake.  Accordingly, regardless of the merits of Liu's second motion for new trial, the trial court did not abuse its discretion in denying it.

---

[9]     An order denying a motion for new trial is not independently appealable but may be reviewed on appeal from the underlying judgment.  (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 19.)

c.     *Accident or Surprise*

Liu argues that the trial court should have granted him a new trial because there was an "[a]ccident or surprise, which ordinary prudence could not have guarded against." (Code Civ. Proc., § 657, subd. 3.)  According to Liu, this accident or surprise consisted of two categories of evidence admitted at trial:  (1) evidence regarding Liu's alleged failure to properly supervise and train agents regarding money laundering; and (2) evidence regarding payments Sun claimed were loans to JSL.  Liu, however, did not make this argument in his first motion for new trial, and thus forfeited the claim of error on appeal. (*Kaufman*, *supra*, 136 Cal.App.4th at p. 226.)

Additionally, before the trial commenced Sun argued in her trial brief that Liu "was found . . . to have violated Prudential's policies against money laundering."  Sun also argued in her trial brief that after Liu converted $39,000 of JSL's funds, she and Unity were compelled to cover JSL's obligations, "and their doing so became loans to JSL."  Thus evidence regarding money laundering and loans from Sun to JSL was not admitted by "accident."  Further, Liu did not argue before or during trial that he was surprised by such evidence, or that he needed a continuance of the trial in order to respond to it.  "It is well settled that a party's right to a new trial upon the ground of surprise is waived if the alleged surprise is not called to the court's attention by a motion for a continuance or other relief." (*Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 742.)

d.     *Newly Discovered Evidence*

A motion for new trial can be granted if there is "[n]ewly discovered evidence, material for the party making the application, which he could not, with reasonable diligence, have discovered and produced at the trial." (Code Civ. Proc.*,* § 657, subd. 4.)  Liu contends that he presented such evidence in his first motion for new trial.  This evidence consisted of a U5 form filed by Prudential with the Financial Industry Regulatory Authority after Liu's termination.  Liu contends that the U5 form indicates he was terminated for poor performance, and not for money laundering.

19

The trial court rejected Liu's argument for two main reasons. First, Liu admitted in his deposition that he obtained the U5 form 30 days after his termination by Prudential, long before the commencement of the trial. Second, the trial court stated that the U5 form "would not have altered the court's opinion about Liu's credibility. Liu[']s acts of bleeding the JSL accounts indicate that he is less than trustworthy, and he was continually impeached, both in trial and based upon his inconsistent deposition testimony. Nothing in the 'U5' notice alters the court's findings and the underlying rational of the court as the trier of fact."

We hold that the trial court did not abuse its discretion in denying Liu's motion for new trial on the ground of newly discovered evidence. Liu's deposition testimony indicates that the evidence was not, in fact, "newly discovered."[10] Further, even if the trial court had considered the U5 form at trial, it would have reached the same conclusion regarding Liu's credibility based on numerous other factors. The evidence therefore was not sufficiently "material" to compel the trial court to grant Liu's motion.

e. *Insufficiency of the Evidence*

Liu argues that the trial court should have granted his motion for new trial because there was insufficient evidence to support its decision. (Code Civ. Proc., § 657, subd. 6.) He first contends that Sun's "[c]laim to ownership of 100% of commission checks from Fortune Securities is not supported by substantial evidence." Liu does not cite, however, anything in the record indicating that the trial court made a finding regarding the ownership of Fortune Securities commission checks, or that it based its judgment on such a finding. Liu thus fails to make a coherent legal argument for reversing the judgment based on Sun's alleged claim regarding these checks.

---

[10] Liu did not include the transcript of his deposition testimony in the appellant's appendix on the ground that it was "not relevant to the issues on appeal." The pages of the transcript cited by the trial court, however, were included in the respondents' appendix.

Liu also argues that there was no substantial evidence supporting the trial court's findings that Sun and Unity made loans to JSL. "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

Turning to the evidence of defendants' loans to JSL, Liu admits that Sun testified regarding these loans, but claims that this testimony was insufficient as a matter of law because she did not provide "backup documentation" for her testimony. Liu does not cite any legal authority to support this argument because there is none. The trial court, as the trier of fact, was free to believe or disbelieve Sun's testimony, whether or not she provided any "backup documentation."

Moreover, Sun and Unity produced documentary evidence of their loans, including written summaries of payments they made on behalf of JSL and copies of checks, bank statements, invoices and other documents indicating the payments were made. Liu's argument that there was no substantial evidence to support the trial court's findings regarding Sun's and Unity's loans to JSL is totally without merit.

7.    *Objections to the Referee's Report*

Liu argues that there were "serious accounting issues" presented by Thompson's accounting report on JSL.  After reviewing these issues in great detail over almost five pages of his opening brief, Liu accused Thompson of "merely rubber stamp[ing]" Sun's position.  Liu does not, however, present a coherent *legal* argument as to why the trial court committed reversible error in connection with Thompson's report.  He thus does not meet his burden of showing such error.

## DISPOSITION

The judgment is affirmed.  Respondents Jing Sun and Unity Professional Insurance Services, Inc. are awarded costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

ALDRICH, J.

22