Filed 10/29/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LUXURY ASSET LENDING, LLC, | |
| Plaintiff and Respondent, | G057766 |
| v. | (Super. Ct. No. 30-2016-00880965) |
| PHILADELPHIA TELEVISION NETWORK, INC., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Glenn R. Salter, Judge.  Reversed and remanded with instructions.

Isaacs Clouse Crose & Oxford LLP and John A. Crose, Jr., for Defendant and Appellant.

Law Offices of Stuart A. Katz and Stuart A. Katz for Plaintiff and Respondent.

## INTRODUCTION

Two powerful friends decided to take out significant loans in order to invest in a purported business opportunity overseas. The opportunity, by all accounts, was a complete bust and the friends were unable to pay the loans back. The lender sued to collect what was owed and foreclose on its secured interest in the offered collateral. The defendants failed to answer the lawsuit, and a default judgment was obtained. The lender began to execute on its judgment.

To read the above description, one might think this is a garden-variety collections matter. Certainly, the respondent in this case wanted the lower court to believe as much. But the truth is less like a garden and more like a jungle – a jungle novelist Tom Clancy would have been proud of.

In truth, the purported business opportunity overseas was a scam. The friends had offered as collateral assets which were not theirs to encumber. The third party to whom the assets belonged had no idea they were being encumbered. And the "lender" was another investor in the scam intent not only on recouping its investment, but willing to take as much flesh and scorch as much earth as necessary to do so, all the while waving the default judgment about as a cudgel.

Today we take away the cudgel and send them back for Marquess of Queensbury fisticuffs.

## FACTS

Appellant Philadelphia Television Network, Inc. (PTNI) is a company headquartered in the Commonwealth of Pennsylvania. PTNI has owned and operated WEFG-LD, a low power television broadcast station in Philadelphia. PTNI was the holder of a Federal Communications Commission (FCC) license for the station to produce and disseminate broadcasts. PTNI's two biggest shareholders were Eugene Cliett and Richard Glanton, with Glanton holding the largest block of shares. The PTNI shareholders agreement explicitly restricted the sale, transfer, or pledging of shares

2

without allowing other shareholders a right of first refusal and made any transfer effected in violation of the restriction void.

Glanton is a prominent lawyer who counts among his clients and friends Wayne Curtis "Curt" Weldon, a former Pennsylvania congressman. Sometime around 2016, Weldon, through his numerous contacts, learned about an opportunity to pursue a foreign "transaction," which he decided to share with Glanton. A more apt characterization for this "transaction" would be "scam."

Winston Churchill famously likened the business of forecasting one enemy's intentions to "a riddle wrapped in a mystery inside an enigma." (Winston L.S. Churchill, First Lord of the Admiralty of Great Britain, address to BBC radio (Oct. 1, 1939).) As the narrative below will demonstrate, that describes rather aptly the transaction with which Glanton and Weldon chose to associate themselves.[1]

*The Underlying Transaction*

According to Glanton, he and Weldon were given the chance to manage the $350 million wealth fund of a former Libyan oil minister.[2] After several months of purported due diligence, Glanton told Weldon he thought the deal was legitimate and suggested they travel to Ghana[3] to take custody of the funds with the objective of investing them in American securities.

The trip occurred in the fall of 2015. After arriving in Ghana, Glanton and Weldon met with the client's representative and a local man named Kweku Amedume Thorpe (Kweku), who was purportedly connected to the President of Ghana and had

---

[1] Our description of the transaction is based on documents submitted by Cliett to the trial court, including a chronology about the deal provided to Cliett by Glanton. So far as we can determine from the record, the chronology and facts ascertainable from the documents Cliett submitted remain uncontradicted. Indeed, it appears LAL and its successor in interest have always carefully avoided discussing these facts.

[2] The identity of the supposed client and the reason he or she would direct this opportunity to Weldon as opposed to a professional fund manager remains unclear to us. On its face, this bears a marked resemblance to the "Nigerian prince" e-mails we all saw so often in the mid-2010's.

[3] The nexus between the Libyan client, his/her assets, and the Republic of Ghana also remains unclear to us. A Ghanaian prince?

3

acquired a reputation for "assist[ing]" Libyans in the country. To secure the release of the funds, Glanton and Weldon agreed to wire some $45,000 in "late storage" fees to a company named Standard Express Security which was purportedly holding the funds under the supervision of the Ghanaian Interior Ministry.

After paying these fees, Glanton, Weldon, Kweku, a client family representative, two Standard Express Security representatives, and a purported banker named Chris Obareki (Obareki) met at the Standard Express Security offices to inspect a box containing $100 million in denominations of $100. After observing the bills, they were told it – plus an additional two boxes – comprised the total corpus of funds to be invested. All three boxes were then brought to a bank called ECO Bank[4] where they were inspected and counted.

Two days later, ECO Bank reported the money was real and totaled over $360 million. However, there was just one little snag. Every note contained "an allegedly invisible insignia in Arabic" which required removal in order to deposit the funds in the Central Bank of Ghana.[5] The removal process would cost $2.4 million up front and those involved would have to pay for it out of pocket – the funds in the corpus could not be used. Kweku and Obareki said they would put up $900,000 of their own funds, and asked Glanton and Weldon to put up the remaining money. With some hesitation, Glanton and Weldon said they would put up what funds they could, and apparently did so, in an amount which, like so many things in this case, is not readily discernible.

Once the $2.4 million had been raised, Kweku and Obareki advised Glanton and Weldon the money had been seized by the Central Bank of Ghana's money

---

[4] The record indicates Obareki was CEO of an outfit called Bar Purity, not ECO Bank. Once again, the roles of these entities remains murky.

[5] Why the money had to be deposited in the Central Bank of Ghana . . . unclear.

4

laundering unit. In order to release the money, a $3.6 million fine had to be paid.[6] Once again, Glanton and Weldon's overeager coventurers promised they would pay the majority of the fine if Glanton and Weldon would dig up another $800,000 to cover the remainder. But as per a by-now patently obvious pattern, Obareki and Kweku did not follow through. Once Glanton and Weldon had paid an additional $400,000, Obareki and Kweku reneged on their end of the deal. Too heavily invested to walk away, Glanton and Weldon raised the other half themselves, only to find that the corpus had been confiscated. By whom and why is, of course . . . unclear.

Enter stage left, Brian Roche (Roche) and his affiliate, respondent Luxury Asset Lending (LAL).[7] Glanton was referred to Roche in or around March 2016 to secure a loan to help close the Ghana transaction. Roche and LAL purportedly conducted due diligence review of Glanton and Weldon and their stated assets and made four loans to them between April and July 2016, totaling $530,000. By the time Glanton and Weldon sought the final two loans of just $30,000 and $10,000[8] respectively in June and July 2016, they were already in default on the first two loans of $240,000 and $250,000. In exchange for the additional $40,000 in funding, Roche and LAL insisted Glanton and Weldon pay back an additional (and eye-popping) $3.3 million. Not in the habit of saying no to a bad deal, Glanton and Weldon agreed.

Now, one might be forgiven for wondering what this colossus of cons has to do with the low power television station in Philadelphia and its owner, PTNI. The answer, based on the record before us, is: absolutely nothing.

Which is precisely our point.

---

[6]    This figure represents 10% of the putative corpus. We assume the idea was that the entire $360 million was going to be seized; certainly no one would pay $3.6 million to rescue 2.4 million.

[7]    Roche claims to be affiliated with LAL as an investor, but admits he was the principal person engaged in the deal on LAL's behalf.

[8]    These amounts may be related to Glanton's claim that he was asked by Kweku to pay $20,000 to someone in Ghanaian customs for "pocket change and tips" in order to get the funds released.

PTNI had no perceptible interest in the Ghana scheme. It received none of the LAL loan funds. Yet unbeknownst to the majority of its shareholders, it was on the hook. Without obtaining corporate approval, without even telling the other PTNI shareholders, Glanton had obligated the company as a co-borrower on at least the two largest LAL loans, pledging not only his PTNI shares, but PTNI's *company assets*, as collateral to secure them. And LAL wanted its money.

*The Lawsuit*

On October 13, 2016, LAL filed a complaint in Orange County Superior Court naming PTNI, Glanton, and Weldon as defendants.[9] The complaint alleged 14 causes of action ranging from breach of contract to fraud, and sought $3.79 million along with $530,000 in exemplary damages against Glanton. Nine of the causes of action – for breach of contract, common counts (open book account and money lent), and foreclosure of security – were alleged against PTNI and Glanton. In its fraud claims against Glanton, LAL alleged he had misrepresented his ability to pledge or transfer his PTNI shares and concealed the restrictive provisions in the PTNI shareholders agreement.

On December 6, 2016, LAL filed three proofs of service of summons. These filings showed Weldon had been served on November 2, 2016, and Glanton had been served individually *and* on behalf of PTNI on October 25, 2016, at his home address in Princeton, New Jersey. The proof of service on Glanton as PTNI's CEO indicates the "Notice to the Person Served" section of the summons was filled out to reflect service upon a corporation. There is no evidence in the record that PTNI was served with process via any other method or at any other address.

Along with the proofs of service of summons, LAL filed a request for entry of default against all defendants, and their defaults were entered by the clerk that same

---

9      We raise an eyebrow at LAL's choice of forum. None of the three defendants are California residents. And the first promissory note contains a forum selection clause identifying Los Angeles County Superior Court, Clark County Court in Nevada, or the United States District Court for the Central District of California as the designated forums for any disputes arising from the note.

date.  But, as with the summons and complaint, LAL served PTNI with notice of entry of default only by mailing same to *Glanton's* Princeton address.

LAL submitted a default prove-up packet to the trial court on March 30, 2017, which included a declaration from Roche.  Roche provided no details about the Ghana fiasco underlying the loans LAL was foreclosing, except to call it a "very large scale transaction."  He did, however, take noticeable care to highlight the influential pedigrees of Glanton and Weldon as a high-powered Philadelphia lawyer and former congressman, respectively.[10]

None the wiser, the trial court entered LAL's proposed default judgment against PTNI, Glanton, and Weldon on April 6, 2017.  The judgment totaled $3,897,919.22, inclusive of interest, attorney fees, and costs.

On April 14, 2017, Weldon filed a motion to set aside the default and default judgment against him.  In support of the motion, he filed a declaration which contained bombshell details on LAL's role in the underlying transaction.  Weldon claimed it was Roche who "facilitated and encouraged" the Ghana transaction by "leveraging his relationships" with African royalty and government figures.  Roche had even "admitted that the entire transaction was a scam."  And apparently, Roche was using everything short of a crowbar to get Weldon and Glanton to repay the money "allegedly owed."

Another illuminating point to come from the Weldon declaration concerned Roche's connection to LAL itself.  Weldon said LAL's president was named Brian Quinn.  In late November 2016, Weldon had e-mailed Quinn to ask whether he knew Roche had been harassing the defendants despite Glanton's attempts to settle the

---

[10]    In his declaration in support of default judgment, Roche claimed that his "investigation and due diligence" for the loans led him to discover such details.  Curiously he somehow failed, during said "investigation and due diligence," to corroborate whether Glanton's PTNI shares could actually be pledged as collateral for the loans he approved.

7

litigation.  In response, Quinn asked Weldon to call him so he could explain, ending with this: "Roche is a joke and not involved with me or my company. . . ."

By May 2017, LAL had stipulated to set aside Weldon's default, stay the litigation as to him, and submit it to binding arbitration.  Glanton and PTNI remained as defaulted defendants and LAL was ready to execute on the judgment.  But Glanton filed for Chapter 11 bankruptcy protection on July 13, 2017.[11]

This all left PTNI walking around with a big bull's-eye on its back.  For almost a year it went untargeted while Glanton and LAL presumably negotiated.  But on April 27, 2018, LAL advised the court it had assigned the nearly $3.9 million judgment against PTNI and Glanton to Newport Investment Group, LLC (Newport), a company controlled by Roche.[12]  Three days later, Newport filed a stipulation for an order pursuant to Code of Civil Procedure[13] section 708.510 assigning it Glanton's PTNI shares *as well as* ownership and control of PTNI and its assets, including  the broadcast license for WEFG-LD, subject to FCC approval.

*Cliett's Knowledge of the Facts*

This is not to say Cliett was *completely* in the dark during all of this.  He was aware of Glanton's involvement in a transaction with Roche and LAL as early as April 2016, because Glanton was forwarding him some of his email correspondence with Roche.  As soon as it obtained the default judgment, LAL filed a UCC Financing Statement with the Commonwealth of Pennsylvania naming PTNI as the debtor but there is no proof of service of these notices on PTNI in the record so far as we can see.[14]

---

[11]    While he listed LAL as a creditor in his bankruptcy filings, he did not claim PTNI as a codebtor.

[12]    We deny LAL's request for judicial notice of documents related to the incorporation of Newport; they are irrelevant to the disposition of this appeal.

[13]    All further statutory references are to the Code of Civil Procedure.

[14]    We acknowledge Roche claimed in an e-mail dated September 13, 2018 to have confirmed the notices had been mailed to Cliett through the Secretary of the Commonwealth.  Our observation is merely that there is no formal proof of service that we can find in the record.  Indeed, the record reflects the wrong address listed for Cliett in one of the statements – 1 Johns Lane rather than 2 Johns Lane.  This document designated PTNI company assets as the secured collateral.

Cliett was also aware of Glanton's bankruptcy; he knew in September 2017 that LAL was Glanton's largest creditor and the indebtedness topped $3 million. He also came to know of efforts by LAL to sell PTNI's assets. Sometime around October 2017, he even came to know that LAL had obtained a judgment against Glanton.

Even though he knew these bits and pieces of information, however, the record leaves us with the impression Cliett was not aware of the full *scope* of PTNI's vulnerability until well after the judgment was entered. And neither Glanton nor Roche told him straight out, despite having multiple opportunities.

On September 21, 2016, Cliett wrote a hostile letter to Roche. He had heard Roche was trying to offer WEFG-LD for sale along with its FCC license, and was under the impression LAL premised the ability to do so on its claim to Glanton's shares. He was "not privy to the details" of Roche and Glanton's agreement, he said, but Glanton had no right under the shareholder agreement to pledge the shares as collateral for his loan in the first place.

Roche responded the same day in an e-mail to Cliett, Quinn, Patrick Schreiber and Stephen Park (two individuals who appear to have had a role with PTNI). He forwarded a copy of a "NOTICE OF PENDING SALE" he had issued for the television station, and warned the four – in all capital letters – not to "force [his] hand" or they would be sued personally and "wiped out." He told Cliett not to send him a "stupid letter" again. Several weeks later, however, when LAL actually filed suit against PTNI, he apparently did not see fit to notify anyone but Glanton.

Cliett was not cowed. In December 2017, he fired off another letter to Roche, repeating the admonition about Glanton's shares. Further, he wrote, even if Glanton had the right to pledge the shares, his stake did not give him the ability to bind the company to an asset sale. By this time, there was already a default judgment against PTNI that Cliett did not know about.

He would find out soon enough. On May 4, 2018, LAL filed an action in the Philadelphia Court of Common Pleas to domesticate the California judgment against PTNI and Glanton. Six days later, the Philadelphia court entered an assignment order similar to the one entered in the Orange County court.

Around this time, in May 2018, Cliett says, he was attempting to access FCC databases for company business and found he was locked out. He investigated and came to discover Glanton had filed an application to transfer PTNI's FCC license to Newport. He subsequently discovered the rest of the litigation trail following behind, in both California and Pennsylvania.

He had a decision to make. PTNI was not a large corporation with unlimited assets. There was now a battle going on between it and LAL/Newport on three different fronts – in California, in Pennsylvania, and before the FCC. Where was PTNI to start? Cliett says he sought the advice of FCC counsel, who said PTNI should start with the FCC proceeding and argue the license should not be transferred because the California judgment was void.

*PTNI Fights Back*

PTNI followed its counsel's advice and filed a request for dismissal before the FCC on June 5, 2018. That was granted on November 13, 2018. The FCC ruled the broadcast license was not an interest which could be foreclosed by a lender. However, it acknowledged its "staff have accommodated state court decisions" if proper paperwork has been filed showing there is a court-appointed trustee or receiver authorized to sell the license. Once a buyer has been found, the FCC has been open in the past to approving the transfer of the license from the trustee or receiver to the buyer. Once the sale is complete, the secured lender can collect from the proceeds of the sale. This protocol, FCC observed, had not been followed by Newport or Glanton. However, FCC left the door open to approving a future transfer compliant with the protocol.

10

Perhaps in response to PTNI's motion to dismiss the application to transfer the FCC license, Newport filed a lawsuit on July 27, 2018 in Orange County Superior Court against Cliett and several other individual defendants.[15]  The complaint there alleged 11 causes of action, including intentional interference with contract, breach of fiduciary duty, and fraud.  The defendants removed the suit to federal court in September 2018 and moved to dismiss for lack of personal jurisdiction.  The federal court has since dismissed the suit.[16]

Immediately after receiving the FCC's ruling, Newport went to the Philadelphia court and sought an emergency appointment of a receiver to take control of Glanton's and PTNI's assets, including the station's license, so a transfer could be effectuated; the court granted the request on November 19, 2018, appointing Joseph Bernstein of Spina & Company for the job.  With a receiver appointed, the FCC approved the transfer of the license on November 28, 2018.

PTNI's first appearance in the Philadelphia proceedings did not occur until November 26, 2018, one week after the court appointed a receiver over its assets.[17]  It proceeded to try to overturn the assignment and receivership orders entered by the court in May and November 2018.  And it received some sympathetic responses to those efforts.  On December 19, 2018, it appealed the receivership order to the Pennsylvania appellate court, and three months later, the judge who entered the receivership order sent a letter to the appellate court seeking remand of the case because she had been unable to review all relevant documents filed in connection with the receivership petition, including PTNI's response, and conduct a hearing.  Another judge at the Philadelphia Court of

---

[15]    We deny LAL's request for judicial notice as to the proof of service of the complaint in Newport's suit but grant its request for judicial notice as to the complaint itself.

[16]    PTNI has requested we take judicial notice of the federal court's orders dated March 5, 2019 and June 10, 2019.  We grant the request only as to the latter order, and specifically, only as to the date of the federal court's ultimate disposition of the lawsuit.

[17]    We are not sure why this is the case.  From the record, we can ascertain that Cliett was served with discovery in aid of execution in September 2018, but we are unclear as to the actual date PTNI became aware of the Pennsylvania proceedings.

Common Pleas stayed the action pending the appeal. Newport sought reconsideration of this ruling, was denied, and filed its own appeal.

PTNI then sought an order in the Philadelphia court vacating the California default judgment and vacating the receivership orders. Pending the appeal, the judge denied the request on March 13, 2019. Only a little over a month remained until the two-year window for vacating the default under section 473.5 expired. With no response yet forthcoming from the Pennsylvania appellate court, PTNI decided it had no choice but to come to California and address the root cause of its problem.[18]

*The Motion to Vacate Default*

PTNI filed its motion to vacate and set aside default judgment in this action on April 5, 2019. It sought relief under sections 473.5, 473, subdivision (d), and 587, and under the court's inherent equitable powers. Accompanying the motion was a declaration from Cliett, which outlined the unauthorized nature of Glanton's action and asserted LAL and Glanton had all along concealed from PTNI the extent of its exposure. He explained how he discovered there was a judgment against the company and his reasoning for the strategy he took by going to the FCC and Pennsylvania court first. He also provided documents to the court which gave more details about the Ghana transaction, most of which we have summarized above. The most salient of these details were (1) the Ghana transaction was not only a scam, but potentially also a money-laundering scheme, and (2) LAL was no arms-length lender; indeed, Roche considered himself an investor in the transaction and was actively facilitating it.

Newport, the assignee of LAL's judgment, opposed, of course, complaining mainly that the motion was untimely and PTNI had waited too long to take any action. It argued service of the summons and complaint on Glanton was sufficient notice to the

_____

18      Ironically, it appears the Philadelphia court later chose to vacate its receivership order after the matter was remanded from the appellate court at its request. The Philadelphia court noted that the present appeal was pending before us.

12

corporation, and Cliett and his "team of . . . lawyers" had been aware of the case for two years prior to taking action. It also pointed to the FCC's consent to transfer of WEFG-LD's license and the Philadelphia court's denial of PTNI's motion to vacate, insisting that PTNI was merely teeing up already-rejected arguments. The opposition was accompanied by Roche's declaration, to which he attached numerous pieces of correspondence with Cliett in an attempt to prove Cliett was aware all along of PTNI's exposure.

In its reply brief, PTNI protested LAL's characterization, arguing it only knew *Glanton* had borrowed money and had defaulted on the loan. It also claimed LAL was mischaracterizing what had gone on in the FCC and Pennsylvania proceedings. Further, it said, LAL was attempting to divert the court's attention away from the underlying transaction, which it called a "collusive and concealed scheme by Glanton, Weldon, and Roche (purporting to act for [LAL]) to invest in illicit overseas currency gathering operations in Ghana."

The trial court issued a tentative ruling denying the motion, but at the hearing in May 2019, the judge admitted he had "concerns about the case" and "concerns" even about his own tentative. Nevertheless, he was uncomfortable "looking at the underlying substance" of the matter when the judgment was already two years old and service had been properly effected on a corporate executive. The trial court was skeptical as to why Cliett would have waited to bring the motion after finding out about the judgment in May 2018. PTNI's counsel explained the strategy the corporation took but when asked whether anyone had prevented it from filing the motion in May 2018, he responded "No. The only thing that prevented us was practicality, your Honor."

This response may have sealed the deal for the trial court. It issued its under submission ruling on May 13, 2019, denying the motion, observing "the borrowers were highly sophisticated businessmen and political leaders within the Commonwealth of Pennsylvania." It acknowledged PTNI's motion appealed to both its statutory and

13

inherently equitable powers, but felt the "motion must be denied" because it was untimely for purposes of vacating the default, and in any event, PTNI had not sought relief from both the default and default judgment. Given its belief PTNI had been aware of the judgment as early as October 2017 and as late as May 2018, it did not feel PTNI had provided a "reasonable justification" for "pursu[ing] other avenues" rather than filing its motion earlier.

## DISCUSSION

PTNI's arguments on appeal focus on two main issues: (1) whether the judgment was void; (2) assuming its validity, whether the trial court should have vacated the default and default judgment under its statutory or equitable powers. We need not decide the first issue because we find PTNI should prevail on the second.[19] (See *Natter v. Palm Desert Rent Review Com.* (1987) 190 Cal.App.3d 994, 1001.)

### I. Standard of Review

Trial court rulings on motions for relief from default are subject to an abuse of discretion standard. (See *Henderson v. Pacific Gas & Electric Co*. (2010) 187 Cal.App.4th 215, 230.) Even so, "[w]ith respect to setting aside a default judgment, it is the policy of the law to favor, whenever possible, a hearing on the merits, and appellate courts are much more disposed to affirm an order where the result is to compel a trial on the merits than they are when the judgment by default is allowed to stand and it appears that a substantial defense could be made." (*Orange Empire Nat. Bank v. Kirk* (1968) 259 Cal.App.2d 347, 352.)

### II. Relief Under Section 473.5

Section 473.5 provides relief from default or default judgment to those defendants who, despite proper service, never received "actual notice" of the lawsuit in time to defend against it. (See § 473.5, subd. (a).) To get such relief, the defaulted

___

[19] We also note the trial court did not substantively address the first issue.

14

defendant must submit an affidavit showing the lack of actual notice was not due to its avoidance of service or inexcusable neglect. (*Id.*, subd. (b).) There is also a time limitation on such a motion. It must be served and filed "within a reasonable time" but before the earlier of: (1) 180 days after service of written notice of the default or default judgment on the defendant or (2) two years after entry of the default judgment. (*Id.*, subd. (a).) The trial court may set aside the default or default judgment if it finds the moving defendant has met the timeliness requirement and has shown the lack of actual notice was not due to avoidance of service or inexcusable neglect. (*Id.*, subd. (c).)

Here, the trial court seemingly denied relief under this provision for two reasons. First, it felt PTNI had not brought its motion within a reasonable time after it received actual notice of the default judgment in May 2018. Second, even if the judgment were vacated, the default would still be in place because PTNI's motion did not seek to vacate the default as well as the judgment. It is unclear to what extent either of these reasons predominates over the other. However, the trial court's language indicates it thought it would be an idle act to vacate a defaulted judgment and leave the default in place.

Generally speaking, this is true. (*See Howard Greer Custom Originals v. Capritti* (1950) 35 Cal.2d 886, 888-889 (*Capritti*).) In *Capritti*, the California Supreme Court affirmed the denial of a motion to vacate default judgment made after the defaulted defendant had sought unsuccessfully to vacate the entry of default. (*Id.* at p. 887.) After entry of judgment, the appellant filed a motion to vacate the judgment and it too was denied. (*Id.* at p. 888.) The appellant chose only to appeal the denial of the latter motion. (*Ibid.*) The high court held that to vacate the judgment in that context would be "abortive" as the default would still be of record. (*Ibid.*)

Here, the circumstances are quite different. PTNI only discovered the default well after judgment had been entered. Unlike the appellant in *Capritti*, it had not filed a previous motion to vacate the default and been denied. The trial court thus need

15

not have left the default in place. Section 473.5, subdivision (c) clearly gave it the discretion to vacate the default or default judgment if asked. Here, while the notice of motion itself only mentioned vacating the default judgment, the memorandum of points and authorities expressly argued both the default and the default judgment should be set aside under section 473.5. "As a general rule, the trial court may consider only the grounds stated in the notice of motion. [Citations.] An omission in the notice may be overlooked if the supporting papers make clear the grounds for the relief sought." (*Luri v. Greenwald* (2003) 107 Cal.App.4th 1119, 1125.) The supporting papers here were pellucid, and the trial court should have overlooked the omission.

It was also error for the trial court to deny relief as untimely. PTNI's moving declarations explained why the motion was brought almost one year after discovery of the judgment against it, and its counsel further explained the delay at the hearing. Because of the deception by Roche, LAL, and Glanton, by the time it found out about the judgment, PTNI was facing the loss of its most valuable asset: its FCC license. Being a small company with limited resources facing litigation on three fronts, "practicality," as PTNI's counsel aptly put it, necessitated extinguishing the most threatening fire first – the proceedings before the FCC. Once it did so, it turned its attention to addressing the Pennsylvania proceedings only to discover Newport had already obtained a receivership and transfer of the license. The flames started by the default judgment had spread far beyond their origins in the Orange County Superior Court by the time PTNI came to know of it. We think it eminently reasonable for PTNI to have tried to obtain relief in its home jurisdiction first, before seeking to vacate the judgment in California as a last resort.

The trial court's reasoning on timeliness may well have been based on its observation of "direct evidence in the record suggesting the default judgment was well known by the individuals who now claim control of the defendant corporation at least as late as October 2017, and likely much earlier." Though this direct evidence is not cited,

16

we believe the trial court was referring to an e-mail from Cliett to the son of another PTNI shareholder dated October 29, 2017, where he states LAL "sued and obtained a judgement [*sic*] against" Glanton.

As we suggested in our summary of the facts in this case, and as PTNI has argued in its briefing here and in the trial court, a distinction must be drawn between PTNI's knowledge of a judgment against Glanton versus its knowledge of a judgment against *it*. The two situations naturally engender entirely different responses: A judgment against the company is critical; a judgement against a shareholder is tangential. So LAL and Roche's repeated claims of possessing a long paper trail showing Cliett's knowledge of the LAL loans rings hollow. At best, these documents demonstrate Cliett knew *Glanton* had borrowed money for his personal venture using his PTNI shares as collateral. They do not show Cliett's or any other PTNI shareholder's awareness of any *company* liability.

Cliett's letters to Roche are illuminating on this point. If Cliett knew PTNI was a co-borrower on the loans; if he knew PTNI had signed a security agreement pledging its assets as collateral; if he knew a default judgment had already been entered in California against the company, why fixate on Glanton's shares?

We also cannot ignore the conduct of LAL in the timeline. Had LAL and Roche desired to give actual notice to PTNI of the lawsuit, the default, or the default judgment, they could easily have done so by serving process, notices, and documents on PTNI at its then-registered address. Instead, time and again, LAL chose only to notify Glanton, a man by whom it claimed to have been defrauded! The possibilities we can conjure as to why LAL would do this strike us as unprofessional if not disreputable. But at the very least, it seems LAL did not want PTNI's other stakeholders to find out about the lawsuit or the judgment until it was too late. Such subterfuge ought not be rewarded.

17

It was an abuse of discretion for the trial court not to grant PTNI's request for relief under section 473.5.  But even if PTNI were not entitled to such statutory relief, we are certain it was entitled to equitable relief, as we shall now discuss.

**III.        Equitable Relief from Default and Default Judgment**

"'[A] trial court may . . . vacate a default on equitable grounds even if statutory relief is unavailable.' (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 981.)  The moving party carries the burden of proving that he or she is entitled to equitable relief. (*Moghaddam v. Bone* (2006) 142 Cal.App.4th 283, 290–291.)  We review a challenge to the trial court's denial of a motion to vacate a default on equitable grounds for abuse of discretion.  (*Rappleyea v. Campbell, supra*, 8 Cal.4th at p. 981.)" (*Sakaguchi v. Sakaguchi* (2009) 173 Cal.App.4th 852, 862.)  And "[w]hen a default *judgment* has been obtained, equitable relief may be given only in exceptional circumstances."  (*Rappleyea v. Campbell*, *supra*, 8 Cal.4th at p. 981.) These are such circumstances.

Equitable relief may be based on extrinsic fraud, which "usually arises when a party is denied a fair adversary hearing because he has been 'deliberately kept in ignorance of the action or proceeding, or in some other way fraudulently prevented from presenting his claim or defense.' [Citation.]" (*Kulchar v. Kulchar* (1969) 1 Cal.3d 467, 471.)  It occurs when """"the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff.""'  [Citation.] In those situations, there has not been 'a real contest in the trial or hearing of the case,' and the judgment may be set aside to open the case for a fair hearing.  (*Ibid*.)"""" (*Manson, Iver & York v. Black* (2009) 176 Cal.App.4th 36, 47 (*Manson*).)

""""Extrinsic mistake involves the excusable neglect of a party. [Citation.] When this neglect results in an unjust judgment, without a fair adversary hearing, and the basis for equitable relief is present, this is extrinsic mistake. [Citation.]"' [Citation.]"

18

(*Moghaddam v. Bone, supra,* 142 Cal.App.4th at p. 290.) "To set aside a judgment based on extrinsic fraud or extrinsic mistake, the moving party must satisfy three elements: 'First, the defaulted party must demonstrate that it has a meritorious case. Secondly, the party seeking to set aside the default must articulate a satisfactory excuse for not presenting a defense to the original action. Lastly, the moving party must demonstrate diligence in seeking to set aside the default once it had been discovered.' (*Stiles v. Wallis* (1983) 147 Cal.App.3d 1143, 1147–1148 (Stiles), italics added; see also *Gibble* [*v. Car-Lene Research, Inc.* (1998)] 67 Cal.App.4th [295,] 315.)" (*Moghaddam*, *supra*, 142 Cal.App.4th at 290, italics omitted.)

A more meritorious case is hard to find. And PTNI most certainly has a satisfactory excuse for not presenting a defense to the original complaint because Glanton never told his fellow shareholders the company needed to respond to it. But did PTNI show diligence in seeking to set aside the default after its discovery?

We think the *Manson* case provides useful guidance. There, an individual named Paula Black received service of a complaint mistakenly naming "Pamela" Black as a defendant. (*Manson, supra,* 176 Cal.App.4th at p. 41.) This person had been sued along with a Douglas Shinn for negligence in connection with a motor vehicle accident. The complaint alleged Shinn had been driving a car registered to Pamela Black at the time of the accident. (*Id.* at p. 40.) But the car Shinn drove at the time of the accident had been entrusted to his automotive shop by *Paula* Black's ex-husband for repairs, and Shinn had instead used it without their knowledge. (*Id.* at p. 41.) Paula Black did not know Shinn and had no idea the vehicle registered in her name had been in an accident. (*Ibid.*) When she received service of the complaint, she notified plaintiff's counsel of the mistaken identity – she was not Pamela Black and knew nothing about any of the parties or the accident. (*Id.* at p. 41.) Plaintiff's counsel did not investigate whether he had the right person – instead, he took Pamela Black's default. (*Id.* at p. 40.) Paula Black received a copy of the default judgment naming Pamela Black and again assumed she

19

was mistakenly receiving legal documents meant for someone else. (*Id.* at p. 41.) Six years later, plaintiff sought to correct the mistake and had the judgment amended to reflect Paula Black's name. (*Id.* at p. 40.) Paula Black discovered the default judgment after being served with a notice of judgment debtor examination in her correct name. (*Id.* at p. 41.) She thereafter consulted two attorneys who told her there was nothing she could do. (*Ibid.*) So she did nothing. Three years hence, Paula Black decided to do her own legal research and discovered she could file a motion to try and vacate the judgment. So she did. The court granted it, concluding the judgment had been taken through mistake and there was improper service resulting in a violation of due process. (*Id.* at p. 41.)

The appellate court affirmed the trial court's ruling. The judgment had unjustly been taken against Paula Black without her knowledge because of the mistake in her name. She had acted diligently when served with process by contacting plaintiff's counsel, and plaintiff had taken judgment against her despite knowing there might be a mistake in the named defendants. She was delayed in coming to court to vacate the judgment because she had been advised by attorneys there was nothing she could do.

Granted, Ms. Black was a layperson and PTNI is a corporate entity. But there are parallels in the way both were misled to their detriment concerning the nature of the proceedings of which they were aware. Ms. Black was aware a person of a similar name to hers with her address was a named defendant in a lawsuit. PTNI was aware its executive had taken out a personal loan and pledged his shares as collateral and the lender had obtained a judgment against him. Neither was aware they were actually defendants themselves until well after the judgments had been entered. In both cases, the plaintiff engaged in deceptive tactics. In *Manson*, plaintiff's counsel knew there may have been an error in the names in his complaint but proceeded to judgment anyway. Here, LAL and Roche failed to send notice of the lawsuit, default, and judgment to PTNI's registered address, serving only Glanton, whom they knew not to be

20

trustworthy.[20] And Roche repeatedly communicated with an oblivious Cliett without bothering to set him straight about the true scope of PTNI's exposure. Finally, both Ms. Black and PTNI sought legal advice as to how to proceed upon discovering the judgments against them. Both reasonably acted upon that advice. Why then should one obtain relief and the other should not?

LAL points out that from mid-2018 onward, Cliett was able to mount a defense to Newport's second lawsuit in California. Why, it asks, could PTNI not have filed a motion to vacate in the court just across the street? It is a fair question to ask, although we note Newport did not sue *PTNI* in the second lawsuit; it sued *Cliett* and other individual defendants. Cliett's personal defense presumably entailed different resources from PTNI's corporate defense, though the two were at least somewhat intertwined. But even if we agreed PTNI should have filed its motion then, its neglect in failing to do so was excusable. By mid to late 2018, LAL already had a judgment from the Orange County court and PTNI's focus was on fighting it collaterally in the FCC and in Pennsylvania. In contrast, Newport had not yet reduced its claim against Cliett to a judgment, so it was rational for him to appear and defend against it in the forum where it was sought.

LAL reminds us often of the deference owed the trial court. We appreciate the need for deference and do not approach the question cavalierly. Yet, the diligence or reasonableness analysis in this context is not all that different from the analysis of the equitable defense of laches. Laches is "a failure on the part of a plaintiff to assert his rights in a timely fashion accompanied by a period of delay with consequent results prejudicial to the defendant." (*Rouse v. Underwood* (1966) 242 Cal.App.2d 316, 323.) There, too, application of the defense is entrusted to the discretion of the trial court and

_____

[20] One of PTNI's arguments for deeming the judgment void was the insufficiency of service of notice of default under section 587. Section 587 requires service of such notice at defendant's "last known address." Both parties agree Glanton's address was never a registered address for PTNI.

21

such discretion usually goes undisturbed by the appellate tribunal.  (*Ibid.*)  One exception, however, is in cases of "manifest injustice."  (*Ibid.*)

We fear leaving the trial court's discretion undisturbed in this case would result in such an injustice.  If not vacated, the default judgment gives the imprimatur of legality and enforceability to wrongdoing – arguable usury in furtherance of a fraudulent, potentially unlawful scheme.  To make matters worse, the judgment would pin the financial burden of the wrongdoers' risk-taking on an innocent third party who had no stake in the scheme.  Glanton may have purported to be acting in his corporate capacity on behalf of PTNI when he took out the loans, pledged company assets, accepted service of legal process, and stipulated to assign PTNI's assets to Newport, but in all cases, the record indicates, he was acting ultra vires.  LAL has now channeled his likely unlawful actions into a judgment, and PTNI stands to lose its entire business.  Such a result would run contrary to public policy and the objectives of the law.  We cannot in good conscience countenance it.

LAL takes pains to describe the prejudice it will suffer should the judgment be unwound.  For reasons that should by now be apparent, it will find no sympathy here.  For all its emphasis on the sophistication of its adversaries, LAL was no neophyte either, as the words "luxury" and "asset" juxtaposed in its name are presumably meant to suggest.  Yet it invested in a scam.  It either failed to perform due diligence on the collateral Glanton pledged or it didn't care to perform it.  It filed a lawsuit and – deliberately, by all appearances – failed to properly notify PTNI of the lawsuit, default, or default judgment.  It withheld from the trial court material details about the transaction underlying the lawsuit.  When PTNI discovered the judgment and fought back before the FCC, LAL's successor, Newport, weaponized the courts yet again and retaliated against Cliett and others.  We could continue with the list of affronts, but suffice it to say, should LAL and Newport's years-long investment in belligerence and sleight-of-hand come to naught, it seems to us a most deserved and appropriate return.

22

## IV.    The Assignment Order

In its motion before the trial court, PTNI requested that the April 2018 assignment order also be vacated.  Because the trial court ruled the whole motion was not timely brought, it did not rule on the validity of the assignment order.  In their briefing, the parties argue over whether the assignment order is still appealable, given its entry over two years ago.  But in light of our decision today, we cannot see how this order can remain in place when there is no longer a judgment.

The assignment order was issued under authority of section 708.510, which is part of the Enforcement of Judgments Law.  For purposes of the Enforcement of Judgments Law, a judgment creditor is someone "in whose favor a judgment is rendered."  (See § 680.240.)  Upon remand, there will no longer be a judgment in LAL's favor.  Once a judgment is vacated, it can no longer be enforced.  (See *Bulmash v. Davis* (1979) 24 Cal.3d 691, 697.)  As goes the judgment, so must go the assignment order.

## DISPOSITION

The order denying the motion to vacate default judgment is reversed and remanded with instructions for the trial court to vacate the default, default judgment and assignment order entered April 30, 2018.  Appellant to recover its costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


FYBEL, J.


GOETHALS, J.

23